Jeffery Owensby, Esq. (Cal. Bar No. 105229)
REDIGER, McHUGH & OWENSBY, LLP
555 Capitol Mall, Suite 1240
Sacramento, California 95814
Telephone: (916) 442-0033
Facsimile: (916) 498-1246
E-mail: jowensby@rmlaw.net
E-mail: srlustig@rmlaw.net

Gregory M. Hatton, Esq. (Cal. Bar No. 119810)
HATTON PETRIE & STACKLER APC
20281 Birch Street, Suite 100
Newport Beach, California 92660
Telephone: (949) 474-4222
Facsimile: (949) 474-1224
E-mail: g_hatton@hattonpetrie.com

Attorneys for Defendants,
DAMERON HOSPITAL ASSOCIATION
and NICHOLAS ARISMENDI

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OTASHE GOLDEN, M.D.; THE CALIFORNIA PRIMARY CARE MEDICAL GROUP, INC. and THE CALIFORNIA HOSPITALIST PHYSICIANS, INC., <br><br> Plaintiff(s), <br><br> v. <br><br> DAMERON HOSPITAL ASSOCIATION, a California Non-Profit Association; NICHOLAS ARISMENDI, an individual; DIEGO FERRO, M.D. and DOES 1-10, inclusive, <br><br> Defendant(s). | CASE NO. 2:12−cv−00751−LKK−EFB <br><br> **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' JOINT MOTION TO STAY ACTION AND COMPEL ARBITRATION** <br><br> **Date:** June 18, 2012 <br> **Time:** 10:00 a.m. <br> **Courtroom:** 4 (Hon. Lawrence K. Karlton) |

## I. INTRODUCTION

In defendants' joint motion to compel arbitration and stay the case, defendants proved that the claims set forth in the complaint are all closely related to and connected with the contracts that plaintiffs integrated into the First Amended Complaint ("Complaint"). More specifically, all of the

1
REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION
TO COMPEL ARBITRATION; STAY

claims alleged in the Complaint and under which plaintiffs claim damages arise out of and relate to the rights and obligations of the parties under the three contracts commonly referred to as the "Medical Director Agreement," the "Recruitment Agreement," and the "Hospitalist Agreement." All the claims have their genesis in the contracts.

Plaintiffs essentially argue that the discrimination-like aspects of the case and the common law torts are too obliquely related to the contracts to be sent to arbitration. While the relationship between the some of the alleged acts and the subject contracts may be more "direct" than others, this does not, as plaintiff contends, somehow negate the arbitrability of the claims presented to the court. The test for arbitrability is satisfied by this uncontroverted conclusion: But for the existence of the relationships created by one or more of the contracts described in plaintiffs' complaint, and the parties' performance of those contracts, *none* of the wrongful acts could have occurred.

Put another way, *all* of the wrongful acts alleged in plaintiffs' complaint took place during hospital-related business activities that occurred *solely because* the contracts described in her complaint exist. Absent those contracts and the parties' performance under them, none of the decisions, actions, performance reviews, opinions about plaintiffs, or other foundational facts would have occurred. Correlatively, had the foundational facts not occurred, *none* of plaintiffs' current claims would have arisen or been incorporated into this suit.

Any way the claims in plaintiffs' case are characterized, they all ultimately rely on evidence of what either happened or did not happen during business activities that occurred under one or more of the contracts described in the complaint. Accordingly, since all of the contracts have broad arbitration clauses, all the claims should be referred to binding arbitration.

Notably, plaintiffs accede to binding arbitration of some of the claims that arise out of the three contracts. Plaintiffs concede to arbitration as the proper means to adjudicate the claims for breach of contract as to defendants Dameron and Ferro, breach of the covenant of good faith and fair dealing as to Dameron and Ferro, and Fraud as to Dameron and Ferro.[1] Plaintiffs' acquiescence to binding arbitration of some of the claims that arise out of or relate to the contracts while attempting

---

[1] Plaintiffs' Opposition acknowledges that claims for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Fraud are subject to arbitration, and asserts that the claims listed above are not arbitrable. Plaintiffs' Opposition does not address the Second Claim for Relief (Violation of 42 U.S.C. § 200d) or the Tenth Claim for Relief (Injunctive and Declaratory Relief), so plaintiffs apparently concede that these claims are subject to arbitration as well.

to cobble distinctions for other claims arising from the same three contracts lacks merit. The claims that plaintiffs say should not be referred to arbitration are part and parcel of the same contractually-founded business relationships between plaintiffs on one side and Dameron Hospital, Dameron's Chief Operating Officer, Nicholas Arismendi and Diego Ferro, M.D. on the other side.

Plaintiffs' opposition to defendants' joint motions amounts to: 1). A concession that the arbitration provisions in the Hospitalist and Recruitment Agreements are sufficiently broad to encompass all claims; 2). A recapitulation of some of the allegations of the first amended complaint; and 3). An unsupported and erroneous assertion that the claims for violation of 42 U.S.C. § 1981, interference with business relations, California Civil Code § 51 and defamation are not related to or connected with the same contractually-created business dealings between plaintiffs and defendants.

Plaintiffs' protestations to the contrary, since each of the underlying contracts contains broad arbitration provisions, and since all of the claims alleged by plaintiffs fall within the broad arbitration clauses set forth in the several agreements, the entire case must be arbitrated. Defendants therefore respectfully request that this Court enter an order staying the instant action and compelling arbitration of the parties' disputes pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3, 4. Alternatively, defendants request the Court to stay any claims it finds non-arbitrable until the conclusion of arbitration proceedings as to the arbitrable claims.

## II. PLAINTIFFS' OPPOSITION EFFECTIVELY CONCEDES THAT THE ARBITRATION PROVISIONS IN THE HOSPITALIST AND RECRUITMENT AGREEMENTS ARE SUFFICIENTLY BROAD TO ENCOMPASS ALL THEIR CLAIMS.

Plaintiffs' opposition ignores defendants' contentions and evidence that the arbitration provisions in Hospitalist Agreement (between CHP and Dameron) and the Recruitment Agreement (between CPC and Dameron) are sufficiently broad to encompass all of plaintiffs' claims, including those Golden brings individually. Plaintiffs ignore defendants' contentions and evidence that paragraphs 12 and 13 of the First Amended Complaint establish that Golden, as the sole shareholder of CPC and the majority shareholder and CEO of CHP, had a sufficient interest in these entities' contracts with Dameron to be bound by the arbitration provisions therein. (Moving Memorandum, p. 5:8-10).

Instead, plaintiffs' opposition focuses exclusively on the scope of the arbitration provision in the Medical Director Agreement. By failing even to mention the Hospitalist Agreement or the Recruitment Agreement in their opposition, plaintiffs have conceded that these agreements are sufficiently broad to encompass all their claims. Thus, this motion should be granted even if the court finds that the Medical Director Agreement does not support an order compelling arbitration of all of the claims at issue. In light of plaintiffs' concessions that many of their claims are subject to arbitration, the claims at issue are now limited to the First Claim for Relief (*Golden vs. Dameron* for Violation of 42 U.S.C. § 1981); the Ninth Claim for Relief (*CPC and CHP vs. Arismendi* for Interference with Business Relations); the Eleventh Claim for Relief (*Golden vs. Arismendi* for Defamation); and the Twelfth Claim for Relief (*Golden vs. Dameron* for Violation of California Civil Code § 51).

In another respect, plaintiffs' opposition underscores defendants' contention that the Hospitalist Agreement and the Recruitment Agreement are sufficiently broad to encompass all of plaintiffs' claims. At pages 7:26-8:3 of their opposition memorandum, plaintiffs argue that "no defendant has hinted at any allegation that there were issues with the performance of plaintiff Golden as Medical Director. All allegations by Defendants as to any performance appear limited to the contracts where Plaintiffs THE CALIFORNIA PRIMARY CARE MEDICAL GROUP, INC. and THE CALIFORNIA HOSPITALIST PHYSICIANS, INC. were the contracting parties." While these statements are not entirely true, as defendants anticipate raising performance issues under the Medical Director Agreement as defenses to all claims against Dameron and Arismendi, it is true that defendants also anticipate raising performance issues under the Hospitalist and Recruitment Agreements as to those claims. Thus, defendants concede that the scope of the arbitration provisions in these Agreements is sufficient to encompass Golden's individual claims, as well as the claims of CPC and CHP.

///
///
///
///

## III. THE ARBITRATION PROVISISON IN THE MEDICAL DIRECTOR AGREEMENT IS BROAD AND WAS ENTERED INTO WITH THE INTENT THAT ARBITRATION WOULD SERVE AS THE PRIMARY RECOURSE FOR DISPUTES CONNECTED IN ANY WAY TO THE AGREEMENT.

The crux of plaintiffs' opposition is that the arbitration provision in the Medical Director Agreement is narrow, not broad, and therefore does not encompass claims for violation of 42 U.S.C. § 1981, Interference with Business Relationship, California Civil Code § 51, and Defamation. (Opposition Memo, p. 2:10-13).

Plaintiffs' cases cited in support of this contention reveal that arbitration provisions far more limited than that in the Medical Director Agreement have been broadly construed to encompass disputes related to, generated by, or even touching matters covered by, the contract, regardless of whether the dispute is labeled as a tort or a contract action.

For example, in *Louis Dreyfuss Negoce S.A. v. Blystad Shipping & Trading Inc*. (2nd Cir. 2001) 252 F. 3d 218, 224, the court described a three part inquiry to determine whether a particular dispute falls within the scope of an arbitration provision.

> "First, recognizing that there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. (Citations). Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. (Citations). Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. (Citation). Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'" (Citation).

The court noted that "[n]o fixed rules govern the determination of an arbitration clause's scope; while very expansive language will generally suggest a broad arbitration clause, we have also found broad clauses when examining phrasing slightly more limited. In the end, a court must determine whether, on the one hand, the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the clause." *Id*. at 225. (Citations omitted).

///

1      *Louis Dreyfuss* involved an ocean shipping dispute. The arbitration clause mandated arbitration of "any dispute arising from the making, performance, or termination of this Charter Party . . . ." The court held that this was a broad arbitration provision: "It is difficult to perceive how the language used, i.e., the making, performance, or termination of the charter could be construed as other than intending to cover all disputes **connected** to this lone voyage." Id. at 226; (bold added).

     Here, it is at least equally difficult to perceive how the language of the Medical Director Agreement ("any claim, dispute, or other matter arising out of, related to, or in any way connected with, the performance or failure to perform any term, covenant, or condition of this Agreement") could be construed as other than intending to cover all disputes "connected" in any way to Golden's performance as Medical Director. Notably, the phrase, "arising out of, related to, or in any way connected with" in the Medical Director Agreement is far broader than the phrase, "arising from" in the *Louis Dreyfuss* case. *See Mediterranean Enterprises, Inc. v. Sangyong Corporation* (9th Cir. 1983) 708 F.2d *1458*, 1464 ("arising hereunder" interpreted narrowly, while "arising out of or relating to" interpreted broadly).

     The other provisions of the Medical Director Agreement (Bernasconi Decl., p. 2 and Ex. A thereto) support a broad interpretation of the arbitration provision. The Agreement provides "a full statement of [the parties'] respective responsibilities in connection with the operation of the Departments during the term of this Agreement. (Ex. A, p. 1). The Agreement relates to, among other things, coverage by Contractor Physicians to provide services for patient care and operation of the Departments (Ex. A, p. 4, ¶ 1.3.1); obligations to personnel (Ex. A, p. 7, ¶ 1.8); billing and compensation (Ex. A, p. 9, ¶ 3.1 et seq); termination of the Agreement (Ex. A, p. 12, ¶ 4.2); Golden's service as the primary liaison between administration and the medical staff (Ex. A, Schedule 1.4.2, p. iii, ¶ 2); recruitment and retention of physicians for the departments and/or the hospital ( Ex. A, Schedule 1.4.2, p. iii, ¶ 3); and cooperation with Hospital administrative staff (Ex. A, Schedule 1.4.2, p. iii, ¶ 3); Under the Agreement, Golden was required to "perform such other reasonable duties as may be assigned from time to time by Hospital Administration or the Board of

Directors."  (Ex. A, Schedule 1.4.2, p. iii, ¶ 3);  The agreement is integrated.  (Ex. A, p. 9, ¶ 3.1 et seq).

The breadth of the Medical Director Agreement, read in conjunction with the language of the arbitration provision, leaves little room for doubt that the parties intended that all claims of the type plaintiffs assert in this *litigation* be arbitrated.  Indeed, the Medical Director Agreement is so broad and all-encompassing that even if the Court determines that the arbitration provision is narrow, the issues in this case are not "collateral" to the Agreement, but <u>directly implicate the terms of the Agreement every bit as much as a breach of contract claim would</u>.  *See Mediterranean Enterprises, supra,* 708 F.2d at 1464 (even where arbitration provision is narrowly construed, "disputes or controversies relating to the interpretation and performance of the contract itself" are required to be submitted to arbitration).

The primary case upon which plaintiffs rely, *Cummings v. Fed Ex Ground Package System* (10th Cir. 2005) 404 F. 3d 1258, 1260, demonstrates the difference between a broad arbitration provision, like the one in the Medical Director Agreement, and a narrow provision.  <u>*Cummings* involved an arbitration provision that actually defined the precise type of dispute that the parties would arbitrate</u>, if such a dispute arose: "[i]n the event FedEx Ground acts to terminate this agreement . . . and [plaintiffs] disagrees with such termination or asserts that the actions of defendant are not authorized under the terms of the agreement, then each such disagreement (but no others) shall be settled by arbitration . . . ." Id.  Applying the three part inquiry from *Louis Dreyfuss*, the *Cummings* court found the provision to be narrow.  Noting the plaintiffs did not allege termination of the agreement containing the arbitration provision, the court refused to order to arbitration claims based on oral contracts made prior to the execution of the written agreement. Id. at 1262.

*Cummings* is not just distinguishable from the instant case. Cummings also provides an illustration of what constitutes a "narrow" arbitration clause, and shows how and why the arbitration clause in the Medical Director Agreement is broad and all encompassing.  Moreover, in this case, unlike *Cummings,* no contracts other than those containing the arbitration provisions that are in any way connected to the claims at issue. Here, the arbitration provision in the Medical Director Agreement is much broader than many provisions that have been interpreted broadly in the case law.

7
REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION
TO COMPEL ARBITRATION; STAY

But even if the arbitration provision in the Medical Director Agreement could be interpreted narrowly, a facial comparison of plaintiffs' claims, the potential defenses thereto, and the terms of the Medical Director Agreement read as a whole would still require the Court to order all claims to arbitration under the arbitration clause in that contract.

### IV. CLAIMS BROUGHT UNDER 42 U.S.C. § 1981 AND CALIFORNIA CIVIL CODE §51 AS WELL AS THE TORTS OF INTERFERENCE WITH BUSINESS RELATIONS AND DEFAMATION ARE ALL ARBITRABLE AND COVERED BY THE ARBITRATION CLAUSES

On the most basic level, each of the types of claims about which plaintiffs contest arbitration are not exempted from referral to arbitration. Plaintiffs cite no authority that holds that any of the listed claims are not the sort that can be arbitrated. To the contrary, the Federal Arbitration Act establishes federal policy favoring arbitration of disputes. *Shaffer v. ACS Gov't Servs,* 321 F. Supp. 2d 682 (DC Md. 2004) (Federal policy strongly favors arbitration and any doubts concerning scope of arbitrable issues should be resolved in favor of arbitration; as result, in close-call on arbitrability, court must decide in favor of sending parties to arbitration). In *Republic of Nicar v. Standard Fruit, Co.,* 937 F.2d 469, 475, 479 (9th Cir. 1991) the Ninth Circuit Court of Appeals held: "The standard for determining arbitrability is not a high one," and "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ….", and *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 721 (9th Cir. 1999), see e.g., *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 908 (9th Cir. 1986) (if the "purported agreement … is susceptible of an interpretation" that would require arbitration "any doubts … should be resolved in favor of arbitration").

Further, the parties agreed to arbitrate all such claims and that agreement which pre-dates the conflicts should be enforced despite the recent recalcitrance on the part of plaintiffs to arbitrate all the claims. Federal courts are required to "rigorously" enforce the parties' agreement to arbitrate. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319 (9th Cir. 1996) (holding that the FAA "created a rule of contract construction favoring arbitration"). As such defendants merely ask that the court enforce the arbitration clauses about which there was once unanimous, contractual agreement.

8
REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION
TO COMPEL ARBITRATION; STAY

Plaintiffs' claims all arise out of and/or directly relate to alleged breaches of contracts that contain arbitration agreements and arbitration would have an impact on their claims. *Acevedo Maldonado v PPG Industries, Inc.*, 514 F.2d 614 (1st Cir. 1975) (where contract provides for arbitration of "any controversy or claim arising out of or relating to this agreement or breach thereof....;" such broad language covers contract-generated or contract-related disputes between parties however those may be labeled; it is immaterial whether claims are in contract or in tort, or are couched in terms of contribution owed by one tortfeasor to another).

The analysis of which claims should be sent to arbitration thus turns to an analysis of whether the claims in the complaint arise out of or relate to one or more of the contracts with the aforementioned arbitration clauses. As explained above, the contractually-created relationships and duties are at the roots of all of plaintiffs' claims. In the absence of evidence from plaintiffs that any of the defendants were in any way linked or involved with the plaintiffs <u>outside</u> the contractually-established relationships, all of the claims related to or arising out of the contractual roots of the relationships must be sent to arbitration.

At the risk of redundancy, defendants remind the court of the specific claims in the suit and how each arose from the relationships created by those contracts.

- Plaintiffs formed business relationships with Dameron via the three contracts. Paragraphs 15-17, 22, and 28 of the Complaint.

- Arismendi is the C.O.O. of the hospital and is alleged to have been plaintiff Golden's boss and the point of contact for the other plaintiffs. Paragraphs 8, 17, 22, 24, 26, 29, 36, 38-40, 73, and 74 of the Complaint.

- Plaintiffs acknowledge that Arismendi's involvement with plaintiffs was in Arismendi's capacity as C.O.O. of the hospital. Paragraph 8 of the Complaint.

- There is no evidence proffered by plaintiffs in opposition to the motion to compel arbitration that proves any business relationship between any of the plaintiffs and defendants Dameron and Arismendi that arose outside the hospital and the contractual ties between the parties. Despite the invitation in Defendants' opening brief to point to any source of business relationship upon which plaintiffs sue other than these contracts, plaintiffs' opposition did

not attempt to do so. Nor did plaintiffs file any declarations or evidence which showed that any of the alleged wrongs took place in a milieu that emanated from any connection <u>outside</u> of the contracts referenced in the Complaint. One would assume that if plaintiffs allege or could prove a course of dealings unrelated to the three contracts alleged in the First Amended Complaint they would have done so. Thus, the unmistakable conclusion is that all of plaintiffs and defendants dealings arose out of the contracts and the parties' respective performance under them.

Having thus shown that the contracts are the bases for the relationships between these parties, next comes a summary of the claims and how they tie back into the same contractual relationships.

- Plaintiffs allege differential treatment of GOLDEN and her companies allegedly because of Golden's race. Plaintiffs accuse defendants of mistreatment in regard to GOLDEN's duties, titles, tasks, and communications associated with, and relating directly to the contractually-established positions she held at the hospital. Since the duties, titles, tasks, and communications arose from the contracts, alleged mistreatment in regard to those aspects of the relationship arose out of or related to the same contracts alleged in the Complaint. Alternatively stated, had GOLDEN not held the positions created under the contracts and not experienced alleged mistreatment in those positions, she would not have standing to sue the defendants for either contract, discrimination or other theories related to the vocational history of plaintiffs at Dameron. It also follows that had GOLDEN not held the positions created under the contracts, ARISMENDI would not have had any occasion to engage in the alleged differential treatment in terms of duties, titles, tasks, and communications alleged in the Complaint. See, Paragraphs 21, 22, 35, 40 of the Complaint.

- Plaintiffs also claim to have experienced retaliation at the hands of Dameron and Arismendi. For example, GOLDEN says she got shut out of or shunned regarding her duties, titles, tasks, and communications. To prevail on those claims GOLDEN must prove she had contractual rights to attend certain meetings or interact with other executives in ways from which defendants foreclosed her. (See, e.g., Pls.' First Am. Compl. ¶ 35.) Obviously, those rights arose, if at all, through the contracts. Similarly, GOLDEN alleges that ARISMENDI

had people monitor GOLDEN's performance. The performance of GOLDEN's and the other plaintiffs' professional duties all arose under and related to the contracts. ARISMENDI would not have any motivation to have anybody monitor GOLDEN absent those contracts. Hence to prevail GOLDEN and the other plaintiffs must somehow prove that her contact with the hospital, ARISMENDI, was contractually prohibited from assessing plaintiffs' performance under the contracts. See Pls.' First Am. Compl. ¶ 40. Regardless of the answers to the questions, all of the issues arise out of or relate to the contracts.

- In the same way, plaintiffs allege at Paragraph 37 of the Complaint, that defendants retaliated against plaintiffs by means of efforts by DAMERON, through ARISMENDI, to replace plaintiffs with a new hospitalist group or other vendors. The determination of that issue will necessarily require analysis of whether Plaintiffs were somehow entitled to continue the services provided to DAMERON under the contracts beyond the termination dates specified in the contracts or beyond the notice periods for voluntary termination of those contracts. Those questions must be answered, by necessity, by tracing through the contracts to see what they say on those questions.

- Paragraphs 31 and 32 of the Complaint describe alleged efforts by ARISMENDI to move people out of Plaintiffs' organizations with whom the hospital had contracted. In order to prevail, Plaintiffs will have to prove that: (1) The persons who allegedly changed employment were contractually bound to stay with one or more of plaintiffs; (2) Plaintiffs did not previously breach or the agreements with the persons or excuse performance by those who moved on to other employment; (3) The persons who moved on were not free to do so of their own accord under California law and that any contractual limitations on their ability to change jobs were enforceable; and (4) The departures from plaintiffs' organizations were unlawfully orchestrated by ARISMENDI in a manner prohibited by law and/or the contracts. To establish each of these elements, Plaintiffs will necessarily invoke multiple contracts which contain arbitration clauses − including the employment agreement between FERRO and CPC. (Pls.' First Am. Compl. ¶ 28 and Ex. C-1 (Recruitment Agreement) attached

thereto at p. 8, ¶ 5; Bernasconi Decl. p. 2 and Ex. "B" [FERRO Employment Agreement] attached thereto at p. 12, § 15.)

- Plaintiff also claims that Arismendi defamed her by critiquing her performance during performance of the contractually established duties. Since the complaint speaks of opinions by Arismendi regarding the contractual circumstances under which plaintiffs performed their jobs at Dameron, the alleged critiques of plaintiffs' performance would have been based only upon the contractual duties performed by plaintiffs. Plaintiff points to no other relationship outside those created by contract that could have become the bases for any such alleged comments about plaintiffs' work at Dameron. Paragraphs 94, 95, 96 of the Complaint describe alleged defamation by ARISMENDI. All of the statements attributed to ARISMENDI refer to GOLDEN's performance under the various contracts, and to information or opinions allegedly communicated by ARISMENDI based upon GOLDEN's performance under the various contracts. GOLDEN alleges no basis or context upon which ARISMENDI might possibly form or communicate these opinions other than in the ordinary course of dealings under one or more of the contracts described in the Complaint. Even if the alleged statements were defamatory, ARISMENDI could not have come to know about GOLDEN or her on-the-job conduct in the absence of the contractual relationships alleged in the Complaint.

Importantly, the interpersonal interactions of GOLDEN, ARISMENDI, and FERRO described in the Complaint − including those that form the basis for the tort claims alleged therein − all arose within the context of the business dealings under the contracts described in the Complaint. Simply put, the entire Complaint arises from business dealings that could not possibly have occurred *in the absence of* contracts referenced and quoted above. Since all of the contracts upon which the suit is based contain arbitration clauses, the entire suit should be referred to arbitration for disposition.

Pleading tort and discrimination claims does not alter the analysis. The Complaint remains grounded only on a series of contracts, a series of business dealings arising out of those contracts, and a set of tort claims that arise out of, relate to, and are connected with the contracts. There is no

reasonable alternative reading of the complaint that would support plaintiff's resistance to arbitration.

## V. CONSIDERATIONS OF JUDICIAL ECONOMY AND THE FEDERAL POLICY IN FAVOR OF ARBITRATION REQUIRE THE COURT TO STAY ANY CLAIMS IT FINDS ARE NOT SUBJECT TO ARBITRATION.

Plaintiffs' opposition fails to respond in any meaningful manner to defendants' detailed analysis of the relationship between the contract issues that plaintiffs concede are subject to arbitration and the issues that plaintiffs contend are not subject to arbitration. Plaintiffs also fail to respond to defendants' contentions that principles of judicial economy and efficiency require the Court to stay any claims it finds are not subject to arbitration. Instead, plaintiffs erroneously cite 9 U.S.C. Section 3 for the proposition that the court has no authority to stay non-arbitrable claims.

Plaintiffs' contentions ignore defendants' authorities that establish that the Court not only has the authority to stay non-arbitrable claims, it has the duty to determine whether to do so.

> We have said that a court asked to stay arbitration has four tasks: [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

*Shearson Lehman Hutton, Inc. v. Wagoner* (2nd Cir. 1991) 944 F. 2d 114, 121.

Plaintiffs do not address defendants' detailed contentions that considerations of judicial economy and efficiency support the stay of any non-arbitrable claims. *See U.S. for Use and Benefit of Newton v. Neumann Caribbean Intern., Ltd.* (9th Cir. 1985) 750 F. 2d 1422, 1426-27 ("Considerations of economy and efficiency fully support the District Court's determination that the third party claim and other matters must await the final determination made in connection with the arbitration."). Nor do plaintiffs address defendants' contention that a failure to stay any non-arbitrable claims would be contrary to the federal policy in favor of arbitration. *Harvey v. Joyce* (5th Cir. 2000) 199 F. 3d 790, 795-96 (if non-signatory were forced to try the claims against it, "the arbitration proceedings would be both redundant and meaningless; in effect, thwarting the federal policy in favor of arbitration. Therefore, we fail to see how litigation could proceed as to [non-

signatory] without affecting [signatory's] right to arbitrate. Accordingly, the scope of the order to stay pending arbitration will include all of the plaintiffs' claims asserted against [non-signatory].").

In light of the inextricable relationship between the claims plaintiffs concede are subject to arbitration and the claims plaintiffs contend are not subject to arbitration, the federal policy in favor of arbitration and considerations of judicial economy require the Court to stay any claims it finds are not subject to arbitration.

## VI. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court enter an order staying the instant action and compelling arbitration of the parties' disputes pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 3, 4.

Defendants also request that, in the event the court, deems some claims are not arbitrable, said claims be stayed pending the outcome of the arbitration.

DATED: June 11, 2012.  **REDIGER, McHUGH & OWENSBY, LLP**

By /S/
JEFFERY OWENSBY

DATED: June 11, 2012.  **HATTON PETRIE & STACKLER, APC**

By /S/
GREGORY M. HATTON

Attorney for Defendants,
DAMERON HOSPITAL ASSOCIATION
and NICHOLAS ARISMENDI