1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8             FOR THE EASTERN DISTRICT OF CALIFORNIA

9

OTASHE GOLDEN, M.D.; THE
10  CALIFORNIA PRIMARY CARE
    MEDICAL GROUP, INC. and
11  THE CALIFORNIA HOSPITALIST
    PHYSICIANS, INC.,
12                                    NO. CIV. S-12-0751 LKK/EFB
            Plaintiffs,
13
        v.
14                                        O R D E R
    DAMERON HOSPITAL ASSOCIATION,
15  a California Non-Profit
    Association; NICHOLAS
16  ARISMENDI, an individual;
    DIEGO FERRO, M.D. and
17  DOES 1-10, inclusive,

18            Defendants.
    _____/
19

20        Defendants jointly move to stay this action and to compel

21  arbitration of all of plaintiffs' claims, pursuant to the Federal

22  Arbitration Act ("FAA"), 9 U.S.C. §§ 1, et seq.  For the reasons

23  set forth below, the motion will be granted in part and denied in

24  part.

25  ////

26  ////

                                    1

## I.   INTRODUCTION[1]

Plaintiffs are Dr. Otashe Golden, a California-licensed physician, and two medical companies she owns and operates – California Hospitalist Physicians, Inc. ("CHP") and California Primary Care Medical Group ("CPC").  During the period relevant to the complaint, Dr. Golden was a senior executive at defendant Dameron Hospital Association ("Dameron").   Defendant Nicholas Arismendi is Dameron's Chief Operating Officer.

CHP contracted with Dameron to staff the hospital with California doctors who are ready, willing and able to provide medical services at Dameron.  CPC contracted with defendant Diego Ferro, M.D., so that he could provide medical services at Dameron (as provided for in CHP's contract with Dameron).

### A.   **The Agreements Sought To Be Arbitrated**

Defendants seek arbitration pursuant to three contracts, each of which contain arbitration clauses.  They are: (1) the Medical Director and Professional Services Agreement ("Medical Director Agreement"), a 2008 agreement between Dr. Golden and Dameron, pursuant to which Dr. Golden worked for Dameron as Medical Director of the Departments[2] under the title Vice President of Medical

////

////

---

[1] These introductory statements are taken from plaintiffs' complaint only for the purpose of considering defendants' motion.

[2] The complaint refers to Dr. Golden as "Chief of Medicine," which the court interprets to be the same as "Medical Director of the Departments."

2

1  Affairs   and   Chief   Quality   Officer;[3]   (2)   the   "Hospitalist

2  Agreement," a 2009 agreement between CHP and Dameron, pursuant to

3  which CHP would provide doctors, medical services and hospital

4  administration  services  to  Dameron;[4]  and  (3)  the  "Recruitment

5  Agreement," a 2010 agreement between CPC, Dr. Ferro and Dameron,

6  pursuant to which CPC arranged for Dr. Ferro to provide medical

7  services to Dameron.[5]

8      **B.   The Allegations of the Complaint**

9      Dr. Golden alleges that Dameron discriminated against her in

10  her role as Medical Director because of her race, in violation of

---

12  [3] See First Amended Complaint (Complaint) ¶ 22 (Dkt. No. 6).
Plaintiff Golden makes no mention of this Agreement, by name, in
her complaint.  Moreover, plaintiff asserts that she makes no
13  claims under the Agreement.  However, the Agreement establishes
that  Dr.  Golden  will  serve  as  "Medical  Director  of  the
14  Departments," with the title of "Vice President of Medical Affairs
and  Chief  Quality  Officer."   See  Declaration  of  Scott  A.
15  Bernasconi, Exh. A (Dkt. No. 19-4) ("Medical Director Agreement").
It further establishes that she shall perform her duties "pursuant
16  to the terms of this Agreement."  See Medical Director Agreement
¶ 1.1.1(ii).  Among the specific duties outlined in the Agreement
17  are those alleged in plaintiffs' complaint, including ensuring
quality care to patients, serving on hospital committees, quality
18  assurance and reporting responsibilities.  See Id., Schedule 1.4.2
("Department  Director  Services").   In their Opposition to the
19  motion to compel arbitration, plaintiffs appear to concede that the
Medical Director Agreement governs Dr. Golden's relationship with
20  Dameron.  Accordingly, the court will consider the Agreement as if
it were an exhibit properly attached to the complaint pursuant to
21  Fed. R. Civ. P. 10(c).  See Dunn v. Castro, 621 F.3d 1196, 1205 n.6
(9th Cir. 2010) ("we may consider 'documents whose contents are
22  alleged in a complaint and whose authenticity no party questions,
but which are not physically attached to the [plaintiff's]
23  pleading'").

24  [4] See Bernasconi Declaration (July 26, 2012), Exh. B (Dkt.
Nos. 19-5 & 19-6).
25

26  [5] Complaint ¶ 28; Bernasconi Declaration (July 26, 2012), Exh.
C (Dkt. Nos. 19-7 & 19-8).

1  Title VI, 42 U.S.C. § 2000d, and the Unruh Civil Rights Act, Cal.

2  Civ. Code § 51.[6]  Dr. Golden was the only African-American holding

3  a senior executive position at Dameron during the relevant time

4  period.  Dr. Golden also alleges that Dameron violated her right,

5  pursuant to 42 U.S.C. § 1981, to make and enjoy equal consideration

6  for contracts regardless of her race, in regard to the Hospitalist

7  and Recruitment Agreements.[7]  She further alleges that Arismendi

8  defamed her.

9  ////

10

11      [6] Title VI "forbids discrimination under 'any program or
activity' receiving federal funds." Braunstein v. Arizona Dept.

12  Of Transportation, 683 F.3d 1177, 1188 (9th Cir. 2012).  Plaintiffs
allege that Dameron is a recipient of federal funds.

13

14      California Civil Code § 51 "prohibits business owners from
discriminating against patron[s] on the basis of suspect, arbitrary

15  classifications."  Complaint ¶ 101 (emphasis added).  Whether or
not plaintiff states a claim here – see Johnson v. Riverside

16  Healthcare System, LP, 534 F.3d 1116, 1124 (9th Cir. 2008) (this
Section "does not extend to claims for employment discrimination

17  because other California statutes are specifically tailored to
provide relief for such conduct") – is a matter to be decided on

18  a dismissal motion, whether before the arbitrator (if the claim is
arbitratable), or this court.

19
    [7] Section 1981 protects the rights of "All persons within the

20  jurisdiction of the United States" to "have the same right in every
State and Territory to make and enforce contracts ... as is enjoyed

21  by white citizens."  That right includes "the enjoyment of all
benefits, privileges, terms, and conditions of the contractual

22  relationship," and it applies to "nongovernmental discrimination."
42 U.S.C. § 1981(a)-(c).

23

24  Dr. Golden alleges that Dameron interfered with her Hospitalist
contract rights by, among other things, imposing a specific

25  "billing company" on CHP, and weighing CPC down with unwanted debt
through the Recruitment Agreement.  Dameron did not treat other

26  medical companies with which it contracted, and which were owned
by non-African-Americans, this way.

4

1   CHP and CPC allege contract[8] and fraud claims against Dameron
2   based upon its conduct relating to these Agreements.  Finally, CHP
3   and CPC also allege that Arismendi tortiously interfered with their
4   business relationship with Dr. Ferro by causing Dr. Ferro to breach
5   his contracts with them.

6       **C.   Requests for Arbitration**

7       Plaintiffs concede that all of the claims brought by CHP and
8   CPC against Dameron – Claims 3 through 8, for breach of contract,
9   breach of the covenant of good faith and fair dealing and fraud –
10  are subject to binding arbitration.  Defendants' motion to compel
11  arbitration of those claims will therefore be granted.

12      Defendants Dameron and Arismendi seek arbitration of the
13  discrimination and defamation claims.  Defendants do not specify
14  which agreement or agreements require arbitration of these claims,
15  asserting instead that all the arbitration clauses – which
16  defendants lump together as if there were identical – require
17  arbitration of these claims. Dr. Golden opposes arbitration on the
18  ground that these claims are not based upon any of the Agreements
19  and in any event, the arbitration clauses do not cover these
20  claims.

21      Defendant Arismendi additionally seeks arbitration of the
22  interference with business relationship claim, presumably pursuant
23  to the arbitration clauses of the Hospitalist and Recruitment
24  Agreements.  Plaintiffs CHP and CPC oppose arbitration, asserting

25  _____

26      [8] Specifically, breach of contract and breach of the covenant
    of good faith and fair dealing.

1  that the arbitration clauses of those Agreements do not cover this

2  claim.

3  II.  **THE LAW – FEDERAL ARBITRATION ACT**

4       The Federal Arbitration Act provides that a binding

5  arbitration clause contained in "a contract evidencing a

6  transaction involving [interstate] commerce," is "valid,

7  irrevocable and enforceable."  9 U.S.C. § 2.

8       When determining whether to enforce the arbitration clause,

9  the court bears in mind that:

10          an agreement to arbitrate is a matter of contract: "it
            is a way to resolve those disputes - but only those
11          disputes - that the parties have agreed to submit to
            arbitration."
12

13  Chiron Corp. v. Ortho Diagnostic Systems, Inc., 207 F.3d 1126, 1130

14  (9th Cir. 2000), quoting First Options of Chicago, Inc. v. Kaplan,

15  514 U.S. 938, 943 (1995).  "As with any other contract dispute,"

16  this court first looks "to the express terms" of the contract.

17  Id., 207 F.3d at 1130.  The court's determination is then limited

18  to: (1) whether a valid, enforceable agreement to arbitrate exists;

19  and (2) whether the claims at issue fall within the scope of the

20  agreement to arbitrate.  Id.  If the answer to both of these

21  queries is affirmative, the court must order the parties to

22  arbitrate in accordance with the terms of their agreement.  9

23  U.S.C. § 4.

24       In this case, neither party disputes the existence of valid,

25  enforceable agreements to arbitrate under the three contracts.

26  Accordingly, the court need only concern itself with whether the

6

1  contracts evidence "a transaction involving commerce," and whether

2  the claims at issue fall within the scope of the arbitration

3  clauses of the contracts.

4  **III. STANDARDS**

5      Courts apply the equivalent of a Rule 56 summary judgment

6  standard to motions to compel arbitration.   See Gonzalez v.

7  Citigroup, Inc., 2011 WL 4374997 at *2 (E.D. Cal. 2011) (Karlton,

8  J.).[9]  Under that standard, the moving party – defendants here –

9  must establish their entitlement to an order compelling arbitration

10 as a matter of law.   To do this, defendants must show that there

11 is "no genuine dispute as to any material fact," that would

12 preclude the entry of the order.   See Fed. R. Civ. P. 56(a); Ricci

13 v. DeStefano, 557 U.S. 557, 586 (2009) (it is the movant's burden

14 "to demonstrate that there is 'no genuine issue as to any material

15 fact' and that they are 'entitled to judgment as a matter of

16 law'"); Walls v. Central Contra Costa Transit Authority, 653 F.3d

17 963, 966 (9th Cir. 2011) (per curiam) (same).

18     Here, there are no material facts in dispute.   The existence

19 of the contracts, their connection to commerce and the existence

20 and validity of arbitration clauses within the contracts, are all

21 undisputed.   The sole remaining questions are whether the

22 connection to commerce is sufficient to invoke the FAA, and whether

23 any of the disputes at issue in this lawsuit are within the scope

24

25     [9] Citing Concat LP v. Unilever, PLC, 350 F. Supp.2d 796, 804
   (N.D. Cal. 2004); Invista North America, S.A.R.L. v. Rhodia
26 Polyamide Intermediates S.A.S., 503 F. Supp.2d 195, 200 (D.D.C.
   2007), appeal dism'd, 253 Fed. Appx. 625 (Fed. Cir. 2008).

1    of the arbitration clauses.   These questions are legal matters

2    "governed by federal law."   _Tracer Research Corp. v. National_

3    _Environmental Services Co._, 42 F.3d 1292, 1294 (9th Cir.), _cert._

4    _dismissed_, 515 U.S. 1187 (1994).[10] _United Computer Systems, Inc. v._

5    _AT&T Corp._, 298 F.3d 756, 760 (9th Cir. 2002) ("A decision

6    concerning the arbitrability of a dispute is a question of law").

7         Doubts concerning the scope of arbitrable issues "'should be

8    resolved in favor of arbitration.'"   _Republic of Nicaragua v._

9    _Standard Fruit Co._, 937 F.2d 469, 478-79 (9th Cir.), _cert. denied_,

10   503 U.S. 919 (1991), _quoting_ _Moses H. Cone Mem'l Hosp. V. Mercury_

11   _Const. Corp._, 460 U.S. 1, 24-25 (1983).   This gives due regard to

12   the federal policy favoring arbitration, _Mundi v. Union Sec. Life_

13   _Ins. Co._, 555 F.3d 1042, 1044 (9th Cir. 2009), and the consequent

14   presumption of arbitrability.   _AT&T Technologies, Inc. v._

15   _Communications Workers of America_, 475 U.S. 643, 650 (1986).

16        Notwithstanding the federal policy favoring arbitration,

17   however:

18        arbitration is a matter of contract and a party cannot
         be required to submit to arbitration any dispute which
19        he has not agreed so to submit.   We cannot expand the
         parties' agreement to arbitrate in order to achieve
20        greater efficiency.   The Federal Arbitration Act
         requires piecemeal resolution when necessary to give
21        effect to an arbitration agreement.

22   _Tracer_, 42 F.3d at 1294-95 (citations and quotation marks

23   ////

24   ////

25   _____

26        [10] _Citing_ _Mediterranean Enterprises, Inc. v. Ssangyong Corp._,
     708 F.2d 1458, 1463 (9th Cir. 1983).

1   omitted).[11]

2   **B.  Staying an Action Pending Arbitration**

3   "In any suit ... referable to arbitration," the court "shall

4   on application of one of the parties stay the trial of the action

5   until such arbitration has been had."  9 U.S.C. § 3.

6   **IV.  ANALYSIS**

7   **A.   Applicability of the FAA.**[12]

8   A threshold issue here is whether the FAA applies to these

9   contracts at all.[13]  That is because the FAA, Section 2, "makes

10  'valid, irrevocable, and enforceable' only two types of contracts:

11  those relating to a maritime transaction and those involving

12  commerce."  Bernhardt v. Polygraphic Co. of America, 350 U.S. 198,

13  200 (1956).  It is clear that in enacting the FAA, the Congress

14  legislated under the "broadest permissible exercise" of its

15  Commerce Clause power.  Citizens Bank v. Alafabco, Inc., 539 U.S.

16  52, 56 (2003) (per curiam), citing Allied-Bruce Terminix Cos. V.

17  ////

18  ////

19

20  ⸻⸻⸻⸻

        [11] Quoting United Steelworkers v. Warrior & Gulf Navigation
21  Co., 363 U.S. 574, 582 (1960), and Moses H. Cone, 460 U.S. at 20.

22      [12] After oral argument, the parties, upon request of this
    court, submitted supplemental briefing on whether the contracts are
23  subject to the FAA.

24      [13] Employment contracts in general are not exempt from the
    FAA.  Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119 (2001)
25  ("Section 1 exempts from the FAA only contracts of employment of
    transportation workers"); 9 U.S.C.A. § 1 (FAA does not apply "to
26  contracts of employment of seamen, railroad employees, or any other
    class of workers engaged in foreign or interstate commerce").

1   Dobson, 513 U.S. 265, 273-274 (1995).[14]   As broad as the FAA is

2   however, in order to be within the outer reaches of the Commerce

3   clause, the employment contracts at issue must involve a party who

4   was "working 'in' commerce," "producing goods for commerce," or

5   "engaging in activity that affected commerce." Bernhardt, 350 U.S.

6   at 201.

7       Plaintiffs seem to argue that the services provided by

8   plaintiffs – as opposed to the hospital's activities – do not have

9   a substantial impact on interstate commerce. Dkt. No. 24 at p.2.[15]

10  However, the FAA may apply even if the individual contracts, taken

11  alone, do not have a substantial effect on interstate commerce:

12      Congress' Commerce Clause power may be exercised in
        individual cases without showing any specific effect
13      upon interstate commerce if in the aggregate the
        economic activity in question would "represent a general
14      practice ... subject to federal control."   Only that
        general practice need bear on interstate commerce in a
15      substantial way.

16  Citizens Bank, 539 U.S. at 56-57 (citations and some internal

17  quotation marks omitted).

18  ////

19

20      [14]  The word "involving" in "involving commerce" is broad
    enough that the phrase can be read as "affecting commerce."
21  Citizens Bank, 539 U.S. at 56 ("We have interpreted the term
    "involving commerce" in the FAA as the functional equivalent of the
22  more familiar term "affecting commerce" - words of art that
    ordinarily signal the broadest permissible exercise of Congress'
23  Commerce Clause power"), citing Allied-Bruce Terminix, 513 U.S. at
    273-274.
24
        [15]  "Commonsensical, the contractual provisions under the
25  subject contracts do not put forth activities giving rise to
    sufficient interstate commerce upon which this Court should apply
26  Federal Arbitration Act." Dkt. No. 24 at p.4.

1      From the cases,[16] it appears that the factors this court

2  considers are, without limitation: whether the hospital is itself

3  an interstate entity, or whether its parent, if any, is

4  interstate;[17] whether the doctors serve patients from out of

5  state;[18] whether the equipment and supplies the doctors use in

6  their work come from out of state;[19] whether there is federal

7  ////

8  ────────────────────

9      [16] Both sides rely heavily on cases involving the reach of the
   Commerce Clause in Sherman Act antitrust cases. In both the
10  Sherman Act and the FAA, the Congress has legislated to the
   permissible limits of the Commerce Clause. Sherman Act cases are
11  thus helpful, even if not authoritative, in determining the reach
   of the Commerce Clause in FAA cases.
12

13      [17] Accord, Bhan v. NME Hospitals, Inc., 669 F. Supp. 998, 1011
   (E.D. Cal. 1987) (Karlton, C.J.) (Commerce Clause permitted the
14  antitrust statute to reach conduct of a local hospital where, inter
   alia, "defendants ... are out-of-state-corporations"), aff'd on
15  other grounds, 929 F.2d 1404 (9th Cir.), cert. denied, 502 U.S. 994
   (1991).

16      [18] Accord, Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 330
   (1991) (Commerce Clause permitted the antitrust statute to reach
17  conduct of a hospital whose "primary activity is the provision of
   health care services in a local market," where the services
18  provided by the complaining doctor "are regularly performed for
   out-of-state patients and generate revenues from out-of-state
19  sources").

20      [19] In Allied-Bruce Terminix, 513 U.S. 282, the Supreme Court
   found a sufficient nexus to commerce to warrant application of the
21  FAA based upon, inter alia, the out-of-state source of "the
   termite-treating and house-repairing material used by Allied-Bruce
22  in its ... efforts to carry out the terms" of the contract.
   Accord, Citizens Bank, 539 U.S. at 57 (FAA was applicable where,
23  inter alia, the loans at issue were secured by an "inventory of
   goods assembled from out-of-state parts and raw materials"); Bhan,
24  669 F. Supp. at 1011 (Commerce Clause permitted the antitrust
   statute to reach conduct of a local hospital where, inter alia,
25  "the chemicals, equipment, and supplies used to provide anesthesia
   services at the Hospital were purchased and shipped in interstate
26  commerce").

1  control over the hospital and the doctors' work;[20] whether the

2  hospital's revenues come from interstate or federal sources such

3  as out-of-state insurers or Medicare;[21] and the impact on

4  interstate commerce effected by the "general practice" of which

5  these contracts are a part.[22]

6      Defendants make no assertion that Dameron operates hospitals

7  interstate, or that it treats any out-of-state patients.  However,

8  in their supplemental briefing and submissions, defendants have

9  shown that an overwhelming proportion of the hospital's purchases

10 of devices, equipment and supplies are from out-of-state sources.

11 Moreover, the Medical Director contract calls upon the hospital to,

12 "at its cost and expense, furnish and maintain for the use of the

13 Departments such equipment and furnishings as is necessary for the

14 proper operation and conduct of the Departments ... on consultation

15 with the Medical Director."  Bernasconi Decl. Exh. A at ¶ 2.2.1.

16

17      [20] Accord, Citizens Bank, 539 U.S. at 56-57 ("Nor is
   application of the FAA defeated because the individual
18 debt-restructuring transactions, taken alone, did not have a
   'substantial effect on interstate commerce.'  Congress' Commerce
   Clause power 'may be exercised in individual cases without showing
19 any specific effect upon interstate commerce' if in the aggregate
   the economic activity in question would represent 'a general
20 practice ... subject to federal control'").

21      [21] Accord, Bhan, 669 F. Supp. at 1011 (Commerce Clause
   permitted the antitrust statute to reach conduct of a local
22 hospital where, inter alia, "a substantial portion of the cost for
   anesthesia services is paid for by Medicare and by 'nation-wide and
23 inter-state' insurance carriers").

24      [22] See Citizens Bank, 539 U.S. at 58 ("were there any residual
   doubt about the magnitude of the impact on interstate commerce
25 caused by the particular economic transactions in which the parties
   were engaged, that doubt would dissipate upon consideration of the
26 'general practice' those transactions represent").

1   Also, the hospital "shall consult with Medical Director regarding
2   the acquisition of particular items of Equipment." Id., at ¶
3   2.2.3.  The Hospitalist Agreement and the Recruitment Agreement
4   similarly provide for the provision of equipment and supplies which
5   defendant has shown, are acquired from out-of-state sources.  See
6   Bernasconi Decl. Exh. B at ¶ 2.4 & Exh. C at ¶ 2(e) (plaintiff will
7   provide the equipment).  Since the equipment and supplies that the
8   doctors use, and whose acquisition Dr. Golden oversees, are
9   interstate in nature, the court concludes that the contracts
10  evidence transactions involving interstate commerce.

11      Defendants have also shown that the hospital's revenues come
12  from Medicare and out-of-state insurers.  Moreover, they have shown
13  that both the hospital and the doctors who contract to work there
14  are subject to heavy federal regulation, especially with respect
15  to the treatment of Medicare patients.  Also, it is clear that the
16  general practice of hospital-provided health care has a huge impact
17  on interstate commerce, even if this individual hospital does not.

18      It thus appears to this court that defendants have made a
19  sufficient showing of Dameron's and the contracts' connection to
20  interstate commerce to justify application of the FAA, if otherwise
21  applicable.   In sum, although the hospital appears to be
22  quintessentially local in terms of the services it provides, the
23  interstate nature of the hospital's equipment and supplies, and
24  their acquisition, the level of federal regulation applicable to
25  the hospital and doctors, and the effect of the "general practice"
26  of hospital-based care on interstate commerce, convinces the court

1   that the FAA properly applies here.

2   **B.    The Arbitration Clauses.**

3       Resolution of the motion to compel arbitration requires a

4   careful look at the arbitration clauses at issue here.  Motions to

5   compel arbitration have been decided – in the Ninth Circuit and

6   elsewhere – based upon seemingly insignificant differences in the

7   language used in the respective arbitration clauses.  In this case,

8   although there are three Agreements, two of them – the Medical

9   Director Agreement and the Hospitalist Agreement – contain

10  identical arbitration clauses:

> If any claim, dispute or other matter arising out of,
> related to, or in any way connected with, the
> performance or failure to perform any term, covenant, or
> condition of this Agreement, remains unresolved
> following the procedure under [the immediately preceding
> sub-section], the parties shall settle the dispute by
> final and binding arbitration.

15  See Medical Director Agreement (Dkt. No. 19-4) § 5.9.2; Hospitalist

16  Agreement (Dkt. No. 19-5) § 5.6.2.[23]  The Recruitment Agreement

17  reads differently:

> Any dispute or controversy arising under, out of, in
> connection with, or in relation to this Agreement, any
> amendment hereto, or the breach hereof, ... shall be
> determined and settled by arbitration.

21  See Recruitment Agreement (Dkt. No. 6-5) at § 5.

22  **A.    The Recruitment Agreement.**

23      The arbitration clause of the Recruitment Agreement is in a

24  _____

25      [23] The only difference is that the Medical Director Agreement
    contains what appears to be a typographical error, namely, the word
26  "and" is ungrammatically inserted before the phrase "remains
    unresolved."

1  format that has been well explored by Ninth Circuit cases:

2        when parties intend to include a broad arbitration
       provision, they provide for arbitration "arising out of
3      or relating to" the agreement.

4  Cape Flattery Ltd. v. Titan Maritime, LLC, 647 F.3d 914, 922 (9th

5  Cir. 2011) (citation omitted), cert. denied, 566 U.S. ___, 132 S.

6  Ct. 1862 (2012), quoting Mediterranean Enterprises, Inc. v.

7  Ssangyong Corp., 708 F.2d at 1464.  Similarly, the "in connection

8  with ... this Agreement" language of the Agreement is also given

9  the broadest possible interpretation.  Simula, Inc. v. Autoliv,

10 Inc., 175 F.3d 716, 721 (9th Cir. 1999) (noting that "[e]very court

11 that has construed the phrase 'arising in connection with' in an

12 arbitration clause has interpreted that language broadly").

13     When an arbitration clause is interpreted "broadly," it

14 "reaches every dispute between the parties having a significant

15 relationship to the contract and all disputes having their origin

16 or genesis in the contract."  Id., 175 F.3d at 721.  Further, the

17 dispute at issue "need only 'touch matters' covered by the

18 contract," in order for the court to resolve all doubts in favor

19 of arbitration.  Id., 175 F.3d at 721, quoting Mitsubishi Motors

20 Corp. V. Soler Chrysler-Plymoth, Inc., 473 U.S. 614, 6214 n.13

21 (1985).

22     The arbitration clause of the Recruitment Agreement is

23 therefore given a "broad" interpretation.  Every dispute touching

24 upon that contract, or having its origin in the Agreement is

25 subject to compelled, binding arbitration.

26     This Agreement's broad language contrasts with arbitration

clauses that provide only for the arbitration of disputes "arising under" the agreement, but omitting the "relating to" or "in connection with" language.   Such clauses are given a "narrow" interpretation:

> We have no difficulty finding that "arising hereunder" [a term previously found to be "synonymous with 'arising under'"] is intended to cover a much narrower scope of disputes, <u>i.e.</u>, only those relating to the interpretation and performance of the contract itself.

<u>Mediterranean Enterprises</u>, 708 F.2d at 1464; <u>Tracer</u>, 42 F.3d at 1295 (the Ninth Circuit "narrowly circumscribes the interpretation to be given" the "arising under" arbitration clause).   Thus, by "narrow," the Ninth Circuit means issues relating only to "the interpretation and performance of the contract itself."   <u>Id.</u>

### 1.   Interference with Business Relationship.

Dr. Golden's claim against Arismendi for "Interference with Business Relationship" is plainly covered by the broad arbitration clause of the Recruitment Agreement.   Dr. Golden specifically alleges that Arismendi disrupted the business relationship between CPC, Dameron and Ferro, and caused him (and others) to "not perform as agreed under the employment agreements."   Complaint ¶¶ 87 & 89. Accordingly, this claim is subject to compelled, binding arbitration.

### 2.   Civil Rights and Defamation.

Dr. Golden's civil rights claims appear to involve allegations that Dameron (itself and through its agent, Arismendi), treated the CPC contract (that is, the Recruitment Agreement), differently from contracts Dameron had with medical companies owned by persons who

were not African-American.  Dr. Golden's Section 1981 and Title VI claims therefore relate, at least in part, to the Recruitment Agreement.

Accordingly those claims – as they relate to the Recruitment Agreement – are arbitrable.  That is, the claims that refer to defendants' discriminatory treatment of Dr. Golden in relation to her ability to make and enjoy the benefits of the Recruitment Agreement are arbitratable.  The claims relating to defendants' alleged treatment of Dr. Golden in her role as Medical Director – and pursuant to the Medical Director Agreement – are discussed below.

Similarly, to the degree Dr. Golden asserts that Arismendi defamed her, that claim also is arbitrable, to the degree the defamation was related to the Recruitment Agreement.[24]

**B.   The Medical Director and Hospitalist Agreements.**

As noted above, the Medical Director and Hospitalist Agreements contain arbitration clauses that differ from the arbitration clause of the Recruitment Agreement.  The Medical Director and Hospitalist Agreements provide for the arbitration of:

> any claim, or other matter arising out of, related to, or in any way connected with, <u>the performance or failure to perform any term, covenant, or condition</u> of this Agreement.

---

[24]   For  example, a defamation related to Dr. Golden's performance under the Recruitment Agreement would be arbitratable.  However, a defamation about Dr. Golden's personal life, for example, would not be arbitrable if it had nothing to do with the Recruitment Agreement.  The complaint does not specify each of the allegedly defamatory statements, so the specifics will have to be addressed by the arbitrator.

1  Dkt. No. 7-3 at p.26 (ECF) (emphasis added).  The language is thus
2  an odd juxtaposition of broad and narrow arbitral terms.  The
3  "related to, or in any way connect with" language indicates that
4  a broad construction is called for.  However, the limitation of the
5  clause to matters relating to "performance" or "failure to perform"
6  under the Agreement is a call for a narrow interpretation of the
7  clause.

8      Dr. Golden's solution is to ignore the broad arbitration
9  language, and focus solely on to the "performance" language as
10 proof that the parties intended to arbitrate only "<u>claims of</u>
11 <u>performance or failure to perform any term, covenant or condition</u>
12 <u>of this Agreement</u>."  Dkt. No. 14 at p.7 (emphasis in text).
13 Defendants' solution is to ignore the narrow arbitration language
14 – indeed, in essence defendants urge the court to excise that
15 language entirely – and focus solely on the broad arbitral language
16 as proof that the clause has "universal coverage."

17     The court accepts neither solution.  "In interpreting
18 contractual terms under federal common law, we give effect to the
19 parties' intentions as ascertained from the terms themselves."
20 <u>Schroeder v. U.S.</u>, 569 F.3d 956, 961 (9th Cir. 2009).  It is a
21 "fundamental rule" of contract interpretation that "a court must
22 give effect to every word or term employed by the parties and
23 reject none as meaningless or surplusage in arriving at the
24 intention of the contracting parties." <u>U.S. v. Hathaway</u>, 242 F.2d
25 897, 900 (9th Cir. 1957).  In other words, when examining "the
26 terms" of the contract, the court does not look only at selected

1  words or phrases, but at every word, term and phrase in the
2  contract, so as to give them all meaning, wherever possible.

3    Giving meaning to the "performance" or "lack of performance"
4  language of the clause, it appears that the parties were agreeing
5  to arbitrate disputes arising out of the performance or breach of
6  the contract itself, since "failure to perform" is the language of
7  breach. <u>See, e.g.</u>, <u>Sharpe v. FDIC</u>, 126 F.3d 1147, 1153 (9th Cir.
8  1997) ("The FDIC failed to perform its obligations under the
9  contract.  It is beyond cavil that this failure to perform the
10 express terms of the settlement agreement is a breach").  By its
11 nature, such claims will call for interpretation of the terms of
12 these contracts, so that "performance" or "non-performance" can be
13 determined.

14   Giving meaning to the "related to" and "in connection with"
15 language, it appears that the parties have agreed to arbitrate any
16 matter broadly related to or connected with the performance or
17 breach of the contract.  Therefore, the arbitration will not cover
18 any independent claims – those that can be asserted without any
19 reference to the terms of the contracts – whose only connection to
20 the contract is that they would never have arisen but for the
21 existence of the contract.

22       **1.   Civil Rights and Defamation.**

23           **a.   "But for" causation.**

24   Defendants argue that the relationship between Dr. Golden,
25 Dameron and Arismendi only exists because of the Medical Director
26 Agreement, and the alleged discriminatory treatment of Dr. Golden

1  personally, and Arismendi's alleged defamation of her, could not

2  have occurred but for the existence of the Agreement.  Without that

3  Agreement, they argue, these parties would have had no reason to

4  interact.  Dkt. No. 7-1 at p.5-6.[25]  Defendants' argument however,

5  is precluded by <u>Tracer</u>, 42 F.3d at 1295.

6       In <u>Tracer</u>, the Ninth Circuit held, in language directly

7  applicable here:

> The fact that the tort claim would not have arisen "but
> for" the parties' licensing agreement is not
> determinative.  If proven, defendants' continuing use of
> Tracer's trade secrets would constitute an independent
> wrong from any breach of the licensing and nondisclosure
> agreements.  See Ariz. Rev. Stat. Ann. § 44-407
> (statutory tort remedy does not affect contractual
> remedies, whether or not based on misappropriation of
> trade secrets).   Therefore, it does not require
> interpretation of the contract and is not arbitrable.

14  <u>Id.</u>, 42 F.3d at 1295 (citation omitted).  Here too, defendants'

15  alleged discrimination and defamatory remarks presumably would

16  never have occurred but for the Medical Director Agreement.

17  However, as in <u>Tracer</u>, the discrimination and defamation claims are

18  "independent wrongs" which Dr. Golden could assert whether or not

19  there was an Agreement, and whether or not she or defendants

20  performed or breached the contracts.   Defendants' "but for"

21  arguments do not support arbitration.

**b.   Plaintiff's performance.**

23  Defendants asserted at oral argument that their defense of the

24  ────────────

25       [25] "[T]he relationships in which Plaintiffs[] allege that
'discrimination' occurred <u>would not have existed but for the
contracts signed by GOLDEN containing arbitration provisions</u>."
26  Dkt. No. 7-1 at 8-9 (emphasis in text).

discrimination claims would raise Dr. Golden's allegedly poor performance under the Agreement.   In this way, they argue, Dr. Golden's claims are related to the performance or breach of the terms of the contract.   The court cannot agree.

This case is similar to <u>Tracer</u>, 42 F.3d at 1295.   In that case, the Ninth Circuit interpreted the arbitration clause as being limited to disputes relating to "interpretation or performance of the contract."   <u>Id.</u>, 42 F.3d at 1294.   Because the clause was narrowed in that way, it did not cover a tort claim – trademark infringement in that case – that was related to the contract, but did not involve breach of the contract.   Here too, the wrongs of employment discrimination and defamation are independent of any breach or performance under the Agreement.   Defendants may not defend against the claim by asserting that yes, they did discriminate against Dr. Golden because of her race, and yes they defamed her, but she has no claim because she was a poor performer.[26]

Defendants represent that they will defend the discrimination case by showing that their treatment of Dr. Golden, resulted from her poor performance under the contract.   But this is not enough to bring the discrimination and defamation claims under the arbitration clause.   Dr. Golden's performance under the contract will only be <u>evidence</u> going to whether or not defendants' conduct

_____

[26] For example, Dr. Golden may be able to show that defendants forgave identical performance (or breach) when engaged in by persons who were not African American.

21

1  was discriminatory, and whether or not the statements they made

2  were truthful. But the <u>disputes</u> at issue here are "discrimination"

3  and "defamation" – not Dr. Golden's (or defendants') performance

4  or failure to perform the Agreement.[27]

5      Issues and disputes that are "related to" or "connected with"

6  performance or failure to perform the terms of these Agreements

7  include things like breach of contract, interference with the

8  contract, interference with prospective business advantage,

9  fraudulent inducement, breach of the covenant of good faith and

10 fair dealing, and so on. Discrimination or defamation are

11 independent wrongs having no natural relationship to the contract

12 claims covered by the arbitration agreement.

13     To interpret these clauses as covering discrimination and

14 defamation claims would require that the court excise the

15 "performance" or "failure to perform" language from the Agreements,

16 so that they read instead:

17         any claim, or other matter arising out of, related to,
           or in any way connected with~~, the performance or failure~~
18         ~~to perform any term, covenant, or condition of~~ this
           Agreement.

19

20 The court will not do so.

21     However, the court acknowledges that the complaint is not

22

23     ───────────────

       [27] In any event, the Section 1981 claim arising from Complaint

24 ¶ 37(2) clearly is not covered by any arbitration clause. The
   Complaint there alleges that Dr. Golden was denied the opportunity

25 to enter into a new contract because of her race, a clearly alleged
   violation of Section 1981. As defendants themselves point out,

26 none of the Agreements gives Dr. Golden the right to enter into a
   new contract, so the arbitration clauses cannot cover this claim.

1  clear about exactly how the defamatory statements relate to the
2  Agreements at issue.  If Dr. Golden's claim is that Arismendi made
3  defamatory remarks about her performance as Medical Director, or
4  her performance under any of the other Agreements, then it is
5  arbitrable, because such a claim is "related to" her performance
6  or failure to perform under the Agreements.[28]  Accordingly, the
7  defamation claim will be submitted to arbitration, but only to the
8  extent the alleged defamations related to Dr. Golden's performance
9  or non-performance under the contracts.[29]

10                c.  **Interference with Business Relationship.**

11       As noted above, the Interference with Business Relationship
12  claim is directly related to the Hospitalist (and Recruitment)
13  Agreement.  CHP alleges that Arismendi "intentionally disrupted the
14  relationship between CHP, DAMERON, and physicians under contract
15  with CHP."  Complaint ¶ 88.  This claim can only be related to
16  Arismendi's alleged breach of the Hospitalist Agreement, and is
17  therefore arbitrable.

18  ////

19  ────────────────

20      [28] In interpreting the clause this way, the court adopts the
    method used by a Ninth Circuit panel when faced with a similar mix
21  of broad and narrow arbitration terms.  In United Communications
    Hub, Inc. v. Qwest Communications, Inc., the panel was confronted
22  with a clause that called for the arbitration of "matters relating
    to (a broad term) a fairly narrow set of subjects (invoices and
23  balances)."  46 Fed. Appx. 412, 413 (9th Cir. 2002) (unpublished).
    The panel thus found that disputes relating to the narrow area of
24  "invoices and balances," were arbitrable.

25      [29] If during arbitration proceedings, it is discovered that
    the alleged statements are not related to Dr. Golden's performance
26  under the Agreements, then the arbitrator should not adjudicate the
    claim.

                                  23

1        **C.   Stay of Proceedings.**

2        Because some of the claims and issues in this case are
3    arbitrable and some are not, the question arises whether the court
4    should stay the entire case while awaiting the results of the
5    arbitration.  It is not entirely clear to this court whether its
6    authority to stay the entire case under these circumstances is
7    mandatory or discretionary.  See <u>Ackerman v. Eber (In re Eber)</u>, 687
8    F.3d 1123, 1129 (9th Cir. 2012) (the "FAA provides ... that a court
9    <u>must</u> stay a proceeding if it is satisfied that <u>an issue</u> in the
10   proceeding is arbitratable") (emphasis added); <u>Mediterranean</u>
11   <u>Enterprises</u>, 708 F.3d at 1465 (when some issues were arbitrable and
12   others were not, "the district court did not abuse its discretion
13   by staying the action pending receipt of the results of
14   arbitration").[30]

15       Nevertheless, it is clear that such authority does exist,
16   whether it is mandatory or discretionary.  Accordingly, this court
17   will stay the entire proceeding pending the results of the
18   arbitration.

19   **VI.   CONCLUSION**

20       For the reasons stated above, defendants' motion is **GRANTED**
21   **IN PART** and **DENIED IN PART** as follows:

22       1.   Defendants' motion to compel arbitration of Claims 3

23   _____

24       [30]   <u>Cf.</u>, <u>United Communications</u>, 46 Fed. Appx. at 415
     (unpublished) (remanding to district court "for entry of a stay
25   pending arbitration as to the arbitrable claims and to allow the
     district court to exercise its sound discretion in determining
26   whether or not to proceed in the interim with the non-arbitrable
     claims").

1  through 8 (un-opposed) and Claim 9 (opposed), is **GRANTED**;

2      2.   Defendants' motion to compel arbitration of the civil

3  rights claims (Claims 1, 2 and 12) pursuant to the Medical Director

4  or Hospitalist Agreement is **DENIED**;

5      3.   Defendants' motion to compel arbitration of the civil

6  rights claims pursuant to the Recruitment Agreement, is **GRANTED**,

7  but only to the extent the claims allege defamation or

8  discriminatory treatment related to the Recruitment Agreement;

9      4.   Defendants' motion to compel arbitration of the

10  defamation claim pursuant to the Recruitment Agreement is **GRANTED**,

11  to the degree the defamation relates to that Agreement;

12      5.   Defendants' motion to compel arbitration of the

13  defamation claim pursuant to the Medical Director or Hospitalist

14  Agreement is **GRANTED**, but only to the extent the claim is directly

15  related to Dr. Golden's performance or failure to perform one of

16  these Agreements;[31] and

17      6.   This case is **STAYED** pending resolution of

18  the  arbitration.

19      IT IS SO ORDERED.

20      DATED:  September 18, 2012.

21

22

23                    LAWRENCE K. KARLTON
                     SENIOR JUDGE
                     UNITED STATES DISTRICT COURT
24  _____

25      [31] For example, if Dr. Golden alleges that she was defamed by
defendants' statements that she breached the Agreement, or that she
26  was a poor performer under the Agreement, then the claim is
arbitrable.

                              25