1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

OTASHE GOLDEN, M.D.; THE
10 CALIFORNIA PRIMARY CARE
MEDICAL GROUP, INC. and
11 THE CALIFORNIA HOSPITALIST
PHYSICIANS, INC.,
12                                   NO. CIV. S-12-0751 LKK/EFB
         Plaintiffs,
13
      v.
14                                        O R D E R
DAMERON HOSPITAL ASSOCIATION,
15 a California Non-Profit
Association; NICHOLAS
16 ARISMENDI, an individual;
DIEGO FERRO, M.D. and
17 DOES 1-10, inclusive,

18         Defendants.
   _____/
19

20      Defendants jointly move to stay this action and to compel

21 arbitration of all of plaintiffs' claims, pursuant to the Federal

22 Arbitration Act ("FAA"), 9 U.S.C. §§ 1, et seq.  For the reasons

23 set forth below, the motion will be granted in part and denied in

24 part.

25 ////

26 ////

                                   1

## I.   INTRODUCTION[1]

Plaintiffs are Dr. Otashe Golden, a California-licensed physician, and two medical companies she owns and operates – California Hospitalist Physicians, Inc. ("CHP") and California Primary Care Medical Group ("CPC"). During the period relevant to the complaint, Dr. Golden was a senior executive at defendant Dameron Hospital Association ("Dameron"). Defendant Nicholas Arismendi is Dameron's Chief Operating Officer.

CHP contracted with Dameron to staff the hospital with California doctors who are ready, willing and able to provide medical services at Dameron. CPC contracted with defendant Diego Ferro, M.D., so that he could provide medical services at Dameron (as provided for in CHP's contract with Dameron).

### A.   The Agreements Sought To Be Arbitrated

Defendants seek arbitration pursuant to three contracts, each of which contain arbitration clauses. They are: (1) the Medical Director and Professional Services Agreement ("Medical Director Agreement"), a 2008 agreement between Dr. Golden and Dameron, pursuant to which Dr. Golden worked for Dameron as Medical Director of the Departments[2] under the title Vice President of Medical

////

////

---

[1] These introductory statements are taken from plaintiffs' complaint only for the purpose of considering defendants' motion.

[2] The complaint refers to Dr. Golden as "Chief of Medicine," which the court interprets to be the same as "Medical Director of the Departments."

2

Affairs and Chief Quality Officer;[3] (2) the "Hospitalist Agreement," a 2009 agreement between CHP and Dameron, pursuant to which CHP would provide doctors, medical services and hospital administration services to Dameron;[4] and (3) the "Recruitment Agreement," a 2010 agreement between CPC, Dr. Ferro and Dameron, pursuant to which CPC arranged for Dr. Ferro to provide medical services to Dameron.[5]

**B.  The Allegations of the Complaint**

Dr. Golden alleges that Dameron discriminated against her in her role as Medical Director because of her race, in violation of

_____

[3] See First Amended Complaint (Complaint) ¶ 22 (Dkt. No. 6). Plaintiff Golden makes no mention of this Agreement, by name, in her complaint.  Moreover, plaintiff asserts that she makes no claims under the Agreement.  However, the Agreement establishes that Dr. Golden will serve as "Medical Director of the Departments," with the title of "Vice President of Medical Affairs and Chief Quality Officer."  See Declaration of Scott A. Bernasconi, Exh. A (Dkt. No. 19-4) ("Medical Director Agreement"). It further establishes that she shall perform her duties "pursuant to the terms of this Agreement."  See Medical Director Agreement ¶ 1.1.1(ii).  Among the specific duties outlined in the Agreement are those alleged in plaintiffs' complaint, including ensuring quality care to patients, serving on hospital committees, quality assurance and reporting responsibilities.  See Id., Schedule 1.4.2 ("Department Director Services").  In their Opposition to the motion to compel arbitration, plaintiffs appear to concede that the Medical Director Agreement governs Dr. Golden's relationship with Dameron.  Accordingly, the court will consider the Agreement as if it were an exhibit properly attached to the complaint pursuant to Fed. R. Civ. P. 10(c).  See Dunn v. Castro, 621 F.3d 1196, 1205 n.6 (9th Cir. 2010) ("we may consider 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading'").

[4] See Bernasconi Declaration (July 26, 2012), Exh. B (Dkt. Nos. 19-5 & 19-6).

[5] Complaint ¶ 28; Bernasconi Declaration (July 26, 2012), Exh. C (Dkt. Nos. 19-7 & 19-8).

1  Title VI, 42 U.S.C. § 2000d, and the Unruh Civil Rights Act, Cal.

2  Civ. Code § 51.[6]  Dr. Golden was the only African-American holding

3  a senior executive position at Dameron during the relevant time

4  period.  Dr. Golden also alleges that Dameron violated her right,

5  pursuant to 42 U.S.C. § 1981, to make and enjoy equal consideration

6  for contracts regardless of her race, in regard to the Hospitalist

7  and Recruitment Agreements.[7]  She further alleges that Arismendi

8  defamed her.

9  ////

10

11  _____

   [6] Title VI "forbids discrimination under 'any program or
12  activity' receiving federal funds."  Braunstein v. Arizona Dept.
   Of Transportation, 683 F.3d 1177, 1188 (9th Cir. 2012).  Plaintiffs
13  allege that Dameron is a recipient of federal funds.

14     California Civil Code § 51 "prohibits business owners from
   discriminating against patron[s] on the basis of suspect, arbitrary
15  classifications."  Complaint ¶ 101 (emphasis added).  Whether or
   not plaintiff states a claim here – see Johnson v. Riverside
16  Healthcare System, LP, 534 F.3d 1116, 1124 (9th Cir. 2008) (this
   Section "does not extend to claims for employment discrimination
17  because other California statutes are specifically tailored to
   provide relief for such conduct") – is a matter to be decided on
18  a dismissal motion, whether before the arbitrator (if the claim is
   arbitratable), or this court.

19
       [7] Section 1981 protects the rights of "All persons within the
20  jurisdiction of the United States" to "have the same right in every
   State and Territory to make and enforce contracts ... as is enjoyed
21  by white citizens."  That right includes "the enjoyment of all
   benefits, privileges, terms, and conditions of the contractual
22  relationship," and it applies to "nongovernmental discrimination."
   42 U.S.C. § 1981(a)-(c).

23
   Dr. Golden alleges that Dameron interfered with her Hospitalist
24  contract rights by, among other things, imposing a specific
   "billing company" on CHP, and weighing CPC down with unwanted debt
25  through the Recruitment Agreement.  Dameron did not treat other
   medical companies with which it contracted, and which were owned
26  by non-African-Americans, this way.

1    CHP and CPC allege contract[8] and fraud claims against Dameron
2  based upon its conduct relating to these Agreements.  Finally, CHP
3  and CPC also allege that Arismendi tortiously interfered with their
4  business relationship with Dr. Ferro by causing Dr. Ferro to breach
5  his contracts with them.

6    **C.    Requests for Arbitration**

7    Plaintiffs concede that all of the claims brought by CHP and
8  CPC against Dameron – Claims 3 through 8, for breach of contract,
9  breach of the covenant of good faith and fair dealing and fraud –
10  are subject to binding arbitration.  Defendants' motion to compel
11  arbitration of those claims will therefore be granted.

12    Defendants Dameron and Arismendi seek arbitration of the
13  discrimination and defamation claims.  Defendants do not specify
14  which agreement or agreements require arbitration of these claims,
15  asserting  instead  that  all  the  arbitration  clauses  –  which
16  defendants  lump  together  as  if  there  were  identical  –  require
17  arbitration of these claims.  Dr. Golden opposes arbitration on the
18  ground that these claims are not based upon any of the Agreements
19  and  in  any  event,  the  arbitration  clauses  do  not  cover  these
20  claims.

21    Defendant  Arismendi  additionally  seeks  arbitration  of  the
22  interference with business relationship claim, presumably pursuant
23  to  the  arbitration  clauses  of  the  Hospitalist  and  Recruitment
24  Agreements.  Plaintiffs CHP and CPC oppose arbitration, asserting

25  ――――――――――――――

26    [8] Specifically, breach of contract and breach of the covenant
of good faith and fair dealing.

5

1  that the arbitration clauses of those Agreements do not cover this

2  claim.

3  II.  **THE LAW – FEDERAL ARBITRATION ACT**

4      The Federal Arbitration Act provides that a binding

5  arbitration clause contained in "a contract evidencing a

6  transaction involving [interstate] commerce," is "valid,

7  irrevocable and enforceable."  9 U.S.C. § 2.

8      When determining whether to enforce the arbitration clause,

9  the court bears in mind that:

>           an agreement to arbitrate is a matter of contract: "it
>      is a way to resolve those disputes – but only those
>      disputes – that the parties have agreed to submit to
>      arbitration."

13  Chiron Corp. v. Ortho Diagnostic Systems, Inc., 207 F.3d 1126, 1130

14  (9th Cir. 2000), quoting First Options of Chicago, Inc. v. Kaplan,

15  514 U.S. 938, 943 (1995).  "As with any other contract dispute,"

16  this court first looks "to the express terms" of the contract.

17  Id., 207 F.3d at 1130.  The court's determination is then limited

18  to: (1) whether a valid, enforceable agreement to arbitrate exists;

19  and (2) whether the claims at issue fall within the scope of the

20  agreement to arbitrate.  Id.  If the answer to both of these

21  queries is affirmative, the court must order the parties to

22  arbitrate in accordance with the terms of their agreement.  9

23  U.S.C. § 4.

24      In this case, neither party disputes the existence of valid,

25  enforceable agreements to arbitrate under the three contracts.

26  Accordingly, the court need only concern itself with whether the

6

1  contracts evidence "a transaction involving commerce," and whether
2  the claims at issue fall within the scope of the arbitration
3  clauses of the contracts.

4  **III. STANDARDS**

5      Courts apply the equivalent of a Rule 56 summary judgment
6  standard to motions to compel arbitration.  <u>See</u> <u>Gonzalez v.</u>
7  <u>Citigroup, Inc.</u>, 2011 WL 4374997 at *2 (E.D. Cal. 2011) (Karlton,
8  J.).[9]  Under that standard, the moving party – defendants here –
9  must establish their entitlement to an order compelling arbitration
10 as a matter of law.  To do this, defendants must show that there
11 is "no genuine dispute as to any material fact," that would
12 preclude the entry of the order.  <u>See</u> Fed. R. Civ. P. 56(a); <u>Ricci</u>
13 <u>v. DeStefano</u>, 557 U.S. 557, 586 (2009) (it is the movant's burden
14 "to demonstrate that there is 'no genuine issue as to any material
15 fact' and that they are 'entitled to judgment as a matter of
16 law'"); <u>Walls v. Central Contra Costa Transit Authority</u>, 653 F.3d
17 963, 966 (9th Cir. 2011) (<u>per curiam</u>) (same).

18     Here, there are no material facts in dispute.  The existence
19 of the contracts, their connection to commerce and the existence
20 and validity of arbitration clauses within the contracts, are all
21 undisputed.  The sole remaining questions are whether the
22 connection to commerce is sufficient to invoke the FAA, and whether
23 any of the disputes at issue in this lawsuit are within the scope

24

25     [9] <u>Citing</u> <u>Concat LP v. Unilever, PLC</u>, 350 F. Supp.2d 796, 804
   (N.D. Cal. 2004); <u>Invista North America, S.A.R.L. v. Rhodia</u>
26 <u>Polyamide Intermediates S.A.S.</u>, 503 F. Supp.2d 195, 200 (D.D.C.
   2007), <u>appeal dism'd</u>, 253 Fed. Appx. 625 (Fed. Cir. 2008).

of the arbitration clauses.   These questions are legal matters
"governed by federal law."   <u>Tracer Research Corp. v. National</u>
<u>Environmental Services Co.</u>, 42 F.3d 1292, 1294 (9th Cir.), <u>cert.</u>
<u>dismissed</u>, 515 U.S. 1187 (1994).[10] <u>United Computer Systems, Inc. v.</u>
<u>AT&T Corp.</u>, 298 F.3d 756, 760 (9th Cir. 2002) ("A decision
concerning the arbitrability of a dispute is a question of law").

Doubts concerning the scope of arbitrable issues "'should be
resolved in favor of arbitration.'"   <u>Republic of Nicaragua v.</u>
<u>Standard Fruit Co.</u>, 937 F.2d 469, 478-79 (9th Cir.), <u>cert. denied</u>,
503 U.S. 919 (1991), <u>quoting</u> <u>Moses H. Cone Mem'l Hosp. V. Mercury</u>
<u>Const. Corp.</u>, 460 U.S. 1, 24-25 (1983).   This gives due regard to
the federal policy favoring arbitration, <u>Mundi v. Union Sec. Life</u>
<u>Ins. Co.</u>, 555 F.3d 1042, 1044 (9th Cir. 2009), and the consequent
presumption of arbitrability.   <u>AT&T Technologies, Inc. v.</u>
<u>Communications Workers of America</u>, 475 U.S. 643, 650 (1986).

Notwithstanding the federal policy favoring arbitration,
however:

> arbitration is a matter of contract and a party cannot
> be required to submit to arbitration any dispute which
> he has not agreed so to submit.   We cannot expand the
> parties' agreement to arbitrate in order to achieve
> greater efficiency.   The Federal Arbitration Act
> requires piecemeal resolution when necessary to give
> effect to an arbitration agreement.

<u>Tracer</u>, 42 F.3d at 1294-95 (citations and quotation marks

////

////

_____

[10] <u>Citing</u> <u>Mediterranean Enterprises, Inc. v. Ssangyong Corp.</u>,
708 F.2d 1458, 1463 (9th Cir. 1983).

1  omitted).[11]

2      **B.  Staying an Action Pending Arbitration**

3      "In any suit ... referable to arbitration," the court "shall

4  on application of one of the parties stay the trial of the action

5  until such arbitration has been had."  9 U.S.C. § 3.

6  **IV.  ANALYSIS**

7      **A.   Applicability of the FAA.**[12]

8      A threshold issue here is whether the FAA applies to these

9  contracts at all.[13]  That is because the FAA, Section 2, "makes

10 'valid, irrevocable, and enforceable' only two types of contracts:

11 those relating to a maritime transaction and those involving

12 commerce." Bernhardt v. Polygraphic Co. of America, 350 U.S. 198,

13 200 (1956).  It is clear that in enacting the FAA, the Congress

14 legislated under the "broadest permissible exercise" of its

15 Commerce Clause power. Citizens Bank v. Alafabco, Inc., 539 U.S.

16 52, 56 (2003) (per curiam), citing Allied-Bruce Terminix Cos. V.

17 ////

18 ////

19 _____

20      [11] Quoting United Steelworkers v. Warrior & Gulf Navigation

21 Co., 363 U.S. 574, 582 (1960), and Moses H. Cone, 460 U.S. at 20.

22      [12] After oral argument, the parties, upon request of this
   court, submitted supplemental briefing on whether the contracts are
23 subject to the FAA.

24      [13] Employment contracts in general are not exempt from the
   FAA.  Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119 (2001)
25 ("Section 1 exempts from the FAA only contracts of employment of
   transportation workers"); 9 U.S.C.A. § 1 (FAA does not apply "to
26 contracts of employment of seamen, railroad employees, or any other
   class of workers engaged in foreign or interstate commerce").

Dobson, 513 U.S. 265, 273-274 (1995).[14]   As broad as the FAA is however, in order to be within the outer reaches of the Commerce clause, the employment contracts at issue must involve a party who was "working 'in' commerce," "producing goods for commerce," or "engaging in activity that affected commerce."  Bernhardt, 350 U.S. at 201.

Plaintiffs seem to argue that the services provided by plaintiffs – as opposed to the hospital's activities – do not have a substantial impact on interstate commerce.  Dkt. No. 24 at p.2.[15] However, the FAA may apply even if the individual contracts, taken alone, do not have a substantial effect on interstate commerce:

> Congress' Commerce Clause power may be exercised in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would "represent a general practice ... subject to federal control."  Only that general practice need bear on interstate commerce in a substantial way.

Citizens Bank, 539 U.S. at 56-57 (citations and some internal quotation marks omitted).

////

---

[14]   The word "involving" in "involving commerce" is broad enough that the phrase can be read as "affecting commerce." Citizens Bank, 539 U.S. at 56 ("We have interpreted the term "involving commerce" in the FAA as the functional equivalent of the more familiar term "affecting commerce" - words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power"), citing Allied-Bruce Terminix, 513 U.S. at 273-274.

[15]   "Commonsensical, the contractual provisions under the subject contracts do not put forth activities giving rise to sufficient interstate commerce upon which this Court should apply Federal Arbitration Act."  Dkt. No. 24 at p.4.

1  From the cases,[16] it appears that the factors this court

2  considers are, without limitation: whether the hospital is itself

3  an interstate entity, or whether its parent, if any, is

4  interstate;[17] whether the doctors serve patients from out of

5  state;[18] whether the equipment and supplies the doctors use in

6  their work come from out of state;[19] whether there is federal

7  ////

8

---

9  [16] Both sides rely heavily on cases involving the reach of the
Commerce Clause in Sherman Act antitrust cases. In both the
10  Sherman Act and the FAA, the Congress has legislated to the
permissible limits of the Commerce Clause. Sherman Act cases are
11  thus helpful, even if not authoritative, in determining the reach
of the Commerce Clause in FAA cases.
12

13  [17] Accord, Bhan v. NME Hospitals, Inc., 669 F. Supp. 998, 1011
(E.D. Cal. 1987) (Karlton, C.J.) (Commerce Clause permitted the
antitrust statute to reach conduct of a local hospital where, inter
14  alia, "defendants ... are out-of-state-corporations"), aff'd on
other grounds, 929 F.2d 1404 (9th Cir.), cert. denied, 502 U.S. 994
15  (1991).

16  [18] Accord, Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 330
(1991) (Commerce Clause permitted the antitrust statute to reach
17  conduct of a hospital whose "primary activity is the provision of
health care services in a local market," where the services
18  provided by the complaining doctor "are regularly performed for
out-of-state patients and generate revenues from out-of-state
19  sources").

20  [19] In Allied-Bruce Terminix, 513 U.S. 282, the Supreme Court
found a sufficient nexus to commerce to warrant application of the
21  FAA based upon, inter alia, the out-of-state source of "the
termite-treating and house-repairing material used by Allied-Bruce
22  in its ... efforts to carry out the terms" of the contract.
Accord, Citizens Bank, 539 U.S. at 57 (FAA was applicable where,
23  inter alia, the loans at issue were secured by an "inventory of
goods assembled from out-of-state parts and raw materials"); Bhan,
24  669 F. Supp. at 1011 (Commerce Clause permitted the antitrust
statute to reach conduct of a local hospital where, inter alia,
25  "the chemicals, equipment, and supplies used to provide anesthesia
services at the Hospital were purchased and shipped in interstate
26  commerce").

11

control over the hospital and the doctors' work;[20] whether the

hospital's revenues come from interstate or federal sources such

as out-of-state insurers or Medicare;[21] and the impact on

interstate commerce effected by the "general practice" of which

these contracts are a part.[22]

Defendants make no assertion that Dameron operates hospitals

interstate, or that it treats any out-of-state patients.  However,

in their supplemental briefing and submissions, defendants have

shown that an overwhelming proportion of the hospital's purchases

of devices, equipment and supplies are from out-of-state sources.

Moreover, the Medical Director contract calls upon the hospital to,

"at its cost and expense, furnish and maintain for the use of the

Departments such equipment and furnishings as is necessary for the

proper operation and conduct of the Departments ... on consultation

with the Medical Director."  Bernasconi Decl. Exh. A at ¶ 2.2.1.

---

[20]  Accord, Citizens Bank, 539 U.S. at 56-57 ("Nor is application of the FAA defeated because the individual debt-restructuring transactions, taken alone, did not have a 'substantial effect on interstate commerce.'  Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice ... subject to federal control'").

[21]  Accord, Bhan, 669 F. Supp. at 1011 (Commerce Clause permitted the antitrust statute to reach conduct of a local hospital where, inter alia, "a substantial portion of the cost for anesthesia services is paid for by Medicare and by 'nation-wide and inter-state' insurance carriers").

[22]  See Citizens Bank, 539 U.S. at 58 ("were there any residual doubt about the magnitude of the impact on interstate commerce caused by the particular economic transactions in which the parties were engaged, that doubt would dissipate upon consideration of the 'general practice' those transactions represent").

1   Also, the hospital "shall consult with Medical Director regarding

2   the acquisition of particular items of Equipment."   Id., at ¶

3   2.2.3.   The Hospitalist Agreement and the Recruitment Agreement

4   similarly provide for the provision of equipment and supplies which

5   defendant has shown, are acquired from out-of-state sources.   See

6   Bernasconi Decl. Exh. B at ¶ 2.4 & Exh. C at ¶ 2(e) (plaintiff will

7   provide the equipment).   Since the equipment and supplies that the

8   doctors use, and whose acquisition Dr. Golden oversees, are

9   interstate in nature, the court concludes that the contracts

10  evidence transactions involving interstate commerce.

11       Defendants have also shown that the hospital's revenues come

12  from Medicare and out-of-state insurers.   Moreover, they have shown

13  that both the hospital and the doctors who contract to work there

14  are subject to heavy federal regulation, especially with respect

15  to the treatment of Medicare patients.   Also, it is clear that the

16  general practice of hospital-provided health care has a huge impact

17  on interstate commerce, even if this individual hospital does not.

18       It thus appears to this court that defendants have made a

19  sufficient showing of Dameron's and the contracts' connection to

20  interstate commerce to justify application of the FAA, if otherwise

21  applicable.   In sum, although the hospital appears to be

22  quintessentially local in terms of the services it provides, the

23  interstate nature of the hospital's equipment and supplies, and

24  their acquisition, the level of federal regulation applicable to

25  the hospital and doctors, and the effect of the "general practice"

26  of hospital-based care on interstate commerce, convinces the court

1  that the FAA properly applies here.

2      **B.   The Arbitration Clauses.**

3          Resolution of the motion to compel arbitration requires a

4  careful look at the arbitration clauses at issue here.  Motions to

5  compel arbitration have been decided – in the Ninth Circuit and

6  elsewhere – based upon seemingly insignificant differences in the

7  language used in the respective arbitration clauses.  In this case,

8  although there are three Agreements, two of them – the Medical

9  Director Agreement and the Hospitalist Agreement – contain

10  identical arbitration clauses:

> If any claim, dispute or other matter arising out of,
> related to, or in any way connected with, the
> performance or failure to perform any term, covenant, or
> condition of this Agreement, remains unresolved
> following the procedure under [the immediately preceding
> sub-section], the parties shall settle the dispute by
> final and binding arbitration.

15  See Medical Director Agreement (Dkt. No. 19-4) § 5.9.2; Hospitalist

16  Agreement (Dkt. No. 19-5) § 5.6.2.[23]  The Recruitment Agreement

17  reads differently:

> Any dispute or controversy arising under, out of, in
> connection with, or in relation to this Agreement, any
> amendment hereto, or the breach hereof, ... shall be
> determined and settled by arbitration.

21  See Recruitment Agreement (Dkt. No. 6-5) at § 5.

22      **A.   The Recruitment Agreement.**

23          The arbitration clause of the Recruitment Agreement is in a

24  _____

25      [23] The only difference is that the Medical Director Agreement
    contains what appears to be a typographical error, namely, the word
    "and" is ungrammatically inserted before the phrase "remains
26  unresolved."

1  format that has been well explored by Ninth Circuit cases:

2      when parties intend to include a broad arbitration
        provision, they provide for arbitration "arising out of
3      or relating to" the agreement.

4  Cape Flattery Ltd. v. Titan Maritime, LLC, 647 F.3d 914, 922 (9th

5  Cir. 2011) (citation omitted), cert. denied, 566 U.S. ___ , 132 S.

6  Ct. 1862 (2012), quoting Mediterranean Enterprises, Inc. v.

7  Ssangyong Corp., 708 F.2d at 1464.  Similarly, the "in connection

8  with ... this Agreement" language of the Agreement is also given

9  the broadest possible interpretation.  Simula, Inc. v. Autoliv,

10 Inc., 175 F.3d 716, 721 (9th Cir. 1999) (noting that "[e]very court

11 that has construed the phrase 'arising in connection with' in an

12 arbitration clause has interpreted that language broadly").

13     When an arbitration clause is interpreted "broadly," it

14 "reaches every dispute between the parties having a significant

15 relationship to the contract and all disputes having their origin

16 or genesis in the contract."  Id., 175 F.3d at 721.  Further, the

17 dispute at issue "need only 'touch matters' covered by the

18 contract," in order for the court to resolve all doubts in favor

19 of arbitration.  Id., 175 F.3d at 721, quoting Mitsubishi Motors

20 Corp. V. Soler Chrysler-Plymoth, Inc., 473 U.S. 614, 6214 n.13

21 (1985).

22     The arbitration clause of the Recruitment Agreement is

23 therefore given a "broad" interpretation.  Every dispute touching

24 upon that contract, or having its origin in the Agreement is

25 subject to compelled, binding arbitration.

26     This Agreement's broad language contrasts with arbitration

15

clauses that provide only for the arbitration of disputes "arising under" the agreement, but omitting the "relating to" or "in connection with" language. Such clauses are given a "narrow" interpretation:

> We have no difficulty finding that "arising hereunder" [a term previously found to be "synonymous with 'arising under'"] is intended to cover a much narrower scope of disputes, <u>i.e.</u>, only those relating to the interpretation and performance of the contract itself.

<u>Mediterranean Enterprises</u>, 708 F.2d at 1464; <u>Tracer</u>, 42 F.3d at 1295 (the Ninth Circuit "narrowly circumscribes the interpretation to be given" the "arising under" arbitration clause). Thus, by "narrow," the Ninth Circuit means issues relating only to "the interpretation and performance of the contract itself." <u>Id.</u>

### 1. Interference with Business Relationship.

Dr. Golden's claim against Arismendi for "Interference with Business Relationship" is plainly covered by the broad arbitration clause of the Recruitment Agreement. Dr. Golden specifically alleges that Arismendi disrupted the business relationship between CPC, Dameron and Ferro, and caused him (and others) to "not perform as agreed under the employment agreements." Complaint ¶¶ 87 & 89. Accordingly, this claim is subject to compelled, binding arbitration.

### 2. Civil Rights and Defamation.

Dr. Golden's civil rights claims appear to involve allegations that Dameron (itself and through its agent, Arismendi), treated the CPC contract (that is, the Recruitment Agreement), differently from contracts Dameron had with medical companies owned by persons who

were not African-American.  Dr. Golden's Section 1981 and Title VI claims therefore relate, at least in part, to the Recruitment Agreement.

Accordingly those claims – as they relate to the Recruitment Agreement – are arbitrable.  That is, the claims that refer to defendants' discriminatory treatment of Dr. Golden in relation to her ability to make and enjoy the benefits of the Recruitment Agreement are arbitratable.  The claims relating to defendants' alleged treatment of Dr. Golden in her role as Medical Director – and pursuant to the Medical Director Agreement – are discussed below.

Similarly, to the degree Dr. Golden asserts that Arismendi defamed her, that claim also is arbitrable, to the degree the defamation was related to the Recruitment Agreement.[24]

**B.  The Medical Director and Hospitalist Agreements.**

As noted above, the Medical Director and Hospitalist Agreements contain arbitration clauses that differ from the arbitration clause of the Recruitment Agreement.  The Medical Director and Hospitalist Agreements provide for the arbitration of:

> any claim, or other matter arising out of, related to, or in any way connected with, <u>the performance or failure to perform any term, covenant, or condition</u> of this Agreement.

---

[24]  For  example, a defamation related to Dr. Golden's performance under the Recruitment Agreement would be arbitratable.  However, a defamation about Dr. Golden's personal life, for example, would not be arbitrable if it had nothing to do with the Recruitment Agreement.  The complaint does not specify each of the allegedly defamatory statements, so the specifics will have to be addressed by the arbitrator.

1   Dkt. No. 7-3 at p.26 (ECF) (emphasis added).  The language is thus

2   an odd juxtaposition of broad and narrow arbitral terms.  The

3   "related to, or in any way connect with" language indicates that

4   a broad construction is called for.  However, the limitation of the

5   clause to matters relating to "performance" or "failure to perform"

6   under the Agreement is a call for a narrow interpretation of the

7   clause.

8        Dr. Golden's solution is to ignore the broad arbitration

9   language, and focus solely on to the "performance" language as

10  proof that the parties intended to arbitrate only "<u>claims of</u>

11  <u>performance or failure to perform any term, covenant or condition</u>

12  <u>of this Agreement</u>."  Dkt. No. 14 at p.7 (emphasis in text).

13  Defendants' solution is to ignore the narrow arbitration language

14  – indeed, in essence defendants urge the court to excise that

15  language entirely – and focus solely on the broad arbitral language

16  as proof that the clause has "universal coverage."

17       The court accepts neither solution.  "In interpreting

18  contractual terms under federal common law, we give effect to the

19  parties' intentions as ascertained from the terms themselves."

20  <u>Schroeder v. U.S.</u>, 569 F.3d 956, 961 (9th Cir. 2009).  It is a

21  "fundamental rule" of contract interpretation that "a court must

22  give effect to every word or term employed by the parties and

23  reject none as meaningless or surplusage in arriving at the

24  intention of the contracting parties." <u>U.S. v. Hathaway</u>, 242 F.2d

25  897, 900 (9th Cir. 1957).  In other words, when examining "the

26  terms" of the contract, the court does not look only at selected

1  words or phrases, but at every word, term and phrase in the

2  contract, so as to give them all meaning, wherever possible.

3  Giving meaning to the "performance" or "lack of performance"

4  language of the clause, it appears that the parties were agreeing

5  to arbitrate disputes arising out of the performance or breach of

6  the contract itself, since "failure to perform" is the language of

7  breach.  See, e.g., Sharpe v. FDIC, 126 F.3d 1147, 1153 (9th Cir.

8  1997) ("The FDIC failed to perform its obligations under the

9  contract.  It is beyond cavil that this failure to perform the

10 express terms of the settlement agreement is a breach").  By its

11 nature, such claims will call for interpretation of the terms of

12 these contracts, so that "performance" or "non-performance" can be

13 determined.

14 Giving meaning to the "related to" and "in connection with"

15 language, it appears that the parties have agreed to arbitrate any

16 matter broadly related to or connected with the performance or

17 breach of the contract.  Therefore, the arbitration will not cover

18 any independent claims – those that can be asserted without any

19 reference to the terms of the contracts – whose only connection to

20 the contract is that they would never have arisen but for the

21 existence of the contract.

22                    **1.   Civil Rights and Defamation.**

23                         **a.   "But for" causation.**

24 Defendants argue that the relationship between Dr. Golden,

25 Dameron and Arismendi only exists because of the Medical Director

26 Agreement, and the alleged discriminatory treatment of Dr. Golden

1  personally, and Arismendi's alleged defamation of her, could not

2  have occurred but for the existence of the Agreement.  Without that

3  Agreement, they argue, these parties would have had no reason to

4  interact.  Dkt. No. 7-1 at p.5-6.[25]  Defendants' argument however,

5  is precluded by <u>Tracer</u>, 42 F.3d at 1295.

6      In <u>Tracer</u>, the Ninth Circuit held, in language directly

7  applicable here:

> The fact that the tort claim would not have arisen "but
> for" the parties' licensing agreement is not
> determinative.  If proven, defendants' continuing use of
> Tracer's trade secrets would constitute an independent
> wrong from any breach of the licensing and nondisclosure
> agreements.  See Ariz. Rev. Stat. Ann. § 44-407
> (statutory tort remedy does not affect contractual
> remedies, whether or not based on misappropriation of
> trade secrets).  Therefore, it does not require
> interpretation of the contract and is not arbitrable.

14 <u>Id.</u>, 42 F.3d at 1295 (citation omitted).  Here too, defendants'

15 alleged discrimination and defamatory remarks presumably would

16 never have occurred but for the Medical Director Agreement.

17 However, as in <u>Tracer</u>, the discrimination and defamation claims are

18 "independent wrongs" which Dr. Golden could assert whether or not

19 there was an Agreement, and whether or not she or defendants

20 performed or breached the contracts.  Defendants' "but for"

21 arguments do not support arbitration.

**b.  Plaintiff's performance.**

23 Defendants asserted at oral argument that their defense of the

----

25  [25] "[T]he relationships in which Plaintiffs[] allege that 'discrimination' occurred <u>would not have existed but for the contracts signed by GOLDEN containing arbitration provisions</u>." Dkt. No. 7-1 at 8-9 (emphasis in text).

discrimination claims would raise Dr. Golden's allegedly poor performance under the Agreement.  In this way, they argue, Dr. Golden's claims are related to the performance or breach of the terms of the contract.  The court cannot agree.

This case is similar to <u>Tracer</u>, 42 F.3d at 1295.  In that case, the Ninth Circuit interpreted the arbitration clause as being limited to disputes relating to "interpretation or performance of the contract."  <u>Id.</u>, 42 F.3d at 1294.  Because the clause was narrowed in that way, it did not cover a tort claim – trademark infringement in that case – that was related to the contract, but did not involve breach of the contract.  Here too, the wrongs of employment discrimination and defamation are independent of any breach or performance under the Agreement.  Defendants may not defend against the claim by asserting that yes, they did discriminate against Dr. Golden because of her race, and yes they defamed her, but she has no claim because she was a poor performer.[26]

Defendants represent that they will defend the discrimination case by showing that their treatment of Dr. Golden, resulted from her poor performance under the contract.  But this is not enough to bring the discrimination and defamation claims under the arbitration clause.  Dr. Golden's performance under the contract will only be <u>evidence</u> going to whether or not defendants' conduct

---

[26] For example, Dr. Golden may be able to show that defendants forgave identical performance (or breach) when engaged in by persons who were not African American.

1   was discriminatory, and whether or not the statements they made

2   were truthful.  But the <u>disputes</u> at issue here are "discrimination"

3   and "defamation" – not Dr. Golden's (or defendants') performance

4   or failure to perform the Agreement.[27]

5        Issues and disputes that are "related to" or "connected with"

6   performance or failure to perform the terms of these Agreements

7   include things like breach of contract, interference with the

8   contract, interference with prospective business advantage,

9   fraudulent inducement, breach of the covenant of good faith and

10  fair dealing, and so on.  Discrimination or defamation are

11  independent wrongs having no natural relationship to the contract

12  claims covered by the arbitration agreement.

13       To interpret these clauses as covering discrimination and

14  defamation claims would require that the court excise the

15  "performance" or "failure to perform" language from the Agreements,

16  so that they read instead:

17       any claim, or other matter arising out of, related to,
         or in any way connected with, the performance or failure
18       to perform any term, covenant, or condition of this
         Agreement.

19

20  The court will not do so.

21       However, the court acknowledges that the complaint is not

22

23       [27] In any event, the Section 1981 claim arising from Complaint
         ¶ 37(2) clearly is not covered by any arbitration clause.  The
24       Complaint there alleges that Dr. Golden was denied the opportunity
         to enter into a new contract because of her race, a clearly alleged
25       violation of Section 1981.  As defendants themselves point out,
         none of the Agreements gives Dr. Golden the right to enter into a
26       new contract, so the arbitration clauses cannot cover this claim.

1   clear about exactly how the defamatory statements relate to the

2   Agreements at issue.  If Dr. Golden's claim is that Arismendi made

3   defamatory remarks about her performance as Medical Director, or

4   her performance under any of the other Agreements, then it is

5   arbitrable, because such a claim is "related to" her performance

6   or failure to perform under the Agreements.[28]  Accordingly, the

7   defamation claim will be submitted to arbitration, but only to the

8   extent the alleged defamations related to Dr. Golden's performance

9   or non-performance under the contracts.[29]

10          **c.   Interference with Business Relationship.**

11          As noted above, the Interference with Business Relationship

12   claim is directly related to the Hospitalist (and Recruitment)

13   Agreement.  CHP alleges that Arismendi "intentionally disrupted the

14   relationship between CHP, DAMERON, and physicians under contract

15   with CHP."  Complaint ¶ 88.  This claim can only be related to

16   Arismendi's alleged breach of the Hospitalist Agreement, and is

17   therefore arbitrable.

18   ////

19   ─────────────

20   [28] In interpreting the clause this way, the court adopts the
     method used by a Ninth Circuit panel when faced with a similar mix
     of broad and narrow arbitration terms.  In United Communications

21   Hub, Inc. v. Qwest Communications, Inc., the panel was confronted
     with a clause that called for the arbitration of "matters relating

22   to (a broad term) a fairly narrow set of subjects (invoices and
     balances)."  46 Fed. Appx. 412, 413 (9th Cir. 2002) (unpublished).

23   The panel thus found that disputes relating to the narrow area of
     "invoices and balances," were arbitrable.

24

25   [29] If during arbitration proceedings, it is discovered that
     the alleged statements are not related to Dr. Golden's performance

26   under the Agreements, then the arbitrator should not adjudicate the
     claim.

**C.   Stay of Proceedings.**

Because some of the claims and issues in this case are arbitrable and some are not, the question arises whether the court should stay the entire case while awaiting the results of the arbitration.  It is not entirely clear to this court whether its authority to stay the entire case under these circumstances is mandatory or discretionary.  See <u>Ackerman v. Eber (In re Eber)</u>, 687 F.3d 1123, 1129 (9th Cir. 2012) (the "FAA provides ... that a court <u>must</u> stay a proceeding if it is satisfied that <u>an issue</u> in the proceeding is arbitratable") (emphasis added); <u>Mediterranean Enterprises</u>, 708 F.3d at 1465 (when some issues were arbitrable and others were not, "the district court did not abuse its discretion by staying the action pending receipt of the results of arbitration").[30]

Nevertheless, it is clear that such authority does exist, whether it is mandatory or discretionary.  Accordingly, this court will stay the entire proceeding pending the results of the arbitration.

**VI.   CONCLUSION**

For the reasons stated above, defendants' motion is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.   Defendants' motion to compel arbitration of Claims 3

---

[30]   <u>Cf.</u>, <u>United Communications</u>, 46 Fed. Appx. at 415 (unpublished) (remanding to district court "for entry of a stay pending arbitration as to the arbitrable claims and to allow the district court to exercise its sound discretion in determining whether or not to proceed in the interim with the non-arbitrable claims").

1 | through 8 (un-opposed) and Claim 9 (opposed), is **GRANTED**;

2 |     2.   Defendants' motion to compel arbitration of the civil

3 | rights claims (Claims 1, 2 and 12) pursuant to the Medical Director

4 | or Hospitalist Agreement is **DENIED**;

5 |     3.   Defendants' motion to compel arbitration of the civil

6 | rights claims pursuant to the Recruitment Agreement, is **GRANTED**,

7 | but only to the extent the claims allege defamation or

8 | discriminatory treatment related to the Recruitment Agreement;

9 |     4.   Defendants' motion to compel arbitration of the

10 | defamation claim pursuant to the Recruitment Agreement is **GRANTED**,

11 | to the degree the defamation relates to that Agreement;

12 |     5.   Defendants' motion to compel arbitration of the

13 | defamation claim pursuant to the Medical Director or Hospitalist

14 | Agreement is **GRANTED**, but only to the extent the claim is directly

15 | related to Dr. Golden's performance or failure to perform one of

16 | these Agreements;[31] and

17 |     6.   This case is **STAYED** pending resolution of

18 | the  arbitration.

19 | IT IS SO ORDERED.

20 | DATED:  September 18, 2012.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[31] For example, if Dr. Golden alleges that she was defamed by defendants' statements that she breached the Agreement, or that she was a poor performer under the Agreement, then the claim is arbitrable.